**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0105n.06

**No. 08-6423**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Jan 31, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| WILLIAM H. LONG, | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| Defendant-Appellant. | ) | |
| | | **OPINION** |

BEFORE:  COLE and WHITE, Circuit Judges; O'MEARA, District Judge.[*]

HELENE N. WHITE, Circuit Judge.  William Long appeals from the 168-month sentence imposed on his guilty plea convictions of 19 counts of extortion under color of official right, 18 U.S.C. § 1951, 6 counts of money laundering, 18 U.S.C. § 1956(a)(3)(A), 1 count of providing a firearm and ammunition to a convicted felon, 18 U.S.C. § 922(d), and 1 count of possession with intent to distribute over five kilograms of cocaine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A).  Long challenges, *inter alia*, the calculation of the base offense levels for the drug trafficking and money-laundering offenses.  We VACATE the sentence and REMAND for re-sentencing.

_____

[*]The Honorable John Corbett O'Meara, United States District Court for the Eastern District of Michigan, sitting by designation.

**I.**

A federal grand jury returned a 28-count indictment against Long, the elected Sheriff of Hamilton County, Tennessee, on February 26, 2008. In addition to the 27 counts specified above, count 28 of the indictment charged possession of a firearm during a drug-trafficking offense, 18 U.S.C. § 924(c)(1)(A)(i). Long pleaded guilty to the first 27 counts pursuant to a sealed plea agreement, in which the Government agreed to move to dismiss count 28 at sentencing.

Long objected to the PSR's calculation of the base offense level of 34 for the money laundering counts (20 through 25), and of the base offense level of 34 for the possession with intent to distribute cocaine count (27), both of which resulted in adjusted offense levels of 38.

The PSR grouped the 27 counts into three groups pursuant to U.S.S.G. § 3D1.2, and applied the highest offense level calculated for a single count, i.e., 38, as the adjusted offense level. PSR at ¶¶ 57, 76, 77. On the drug count, the PSR attributed 46.25 kilograms of cocaine to Long. PSR at ¶ 97. The PSR decreased the adjusted offense level of by three levels for acceptance of responsibility, for a total offense level of 35 and criminal history category I, resulting in a Guidelines range of 168 to 210 months.

The district court sentenced Long to an aggregate term of 168 months' imprisonment (168 months on counts 1 to 25 and 26, i.e., the extortion, money-laundering and providing a firearm to a felon counts), and a concurrent 120-month term on the drug count (count 27), and 5 years of supervised release. Long timely appealed.

**II.**

The Indictment charged six counts of money laundering (counts twenty through twenty-five),

18 U.S.C. § 1956(a)(3)(A), stating:

> On or about the below-listed dates . . . Long, with the intent to promote the carrying on of a specified unlawful activity, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property, represented by another person at the direction of a Federal official authorized to investigate and prosecute violations of this section, to be the proceeds of drug trafficking activity in violation of 21 U.S.C. §§ 841 and 846, that is, money as set forth below:

| COUNT | DATE | AMOUNT |
| --- | --- | --- |
| Twenty | December 3, 2007 | $ 550 |
| Twenty-One | December 14, 2007 | $ 1000 |
| Twenty-Two | December 20, 2007 | $ 2000 |
| Twenty-Three | January 18, 2007 | $ 1000 |
| Twenty-Four | January 24, 2008 | $ 2000 |
| Twenty-Five | February 2, 2008 | $ 4,000 |

> All in violation of . . . 18 [USC §] 1956(a)(3)(A).

As to the drug charge, the Indictment referred only to one date --"on or about February 2, 2008":

> On or about February 2, 2008, . . . LONG, did knowingly, intentionally and without authority possess with the intent to distribute five or more kilograms of a mixture and substance containing a detectable amount of cocaine hydrochloride . . . . in violation of [21 U.S.C. §§] 841(a)(1) and 841 (b)(1)(A).

**A**

The revised PSR[1] describes Long's preexisting relationship with Eugene Overstreet, the

FBI's cooperating witness (CW), and how Overstreet came to be a CW:

---

[1]The revised PSR incorporated Long's factual objections.

13. On March 20, 2007, an agent with the [FBI] was conducting an investigation into public corruption and interviewing a potential witness. The witness, Eugene Overstreet, was providing the agent with some information when Mr. Overstreet received a telephone call. Mr. Overstreet's cell phone was turned up loudly enough for the agent to overhear the caller. The agent stated that the caller, identified as Hamilton County Sheriff Billy Long, and Mr. Overstreet discussed a promised $50,000 in campaign contribution from someone, $38,000 of which was still owed to Sheriff Long even though the election was over. When Mr. Overstreet excused himself from the call, informing Sheriff Long that he would have to call him back, the agent questioned him regarding the call, and Mr. Overstreet admitted that the caller was Sheriff Long. The phone call was not recorded.
. . . .

15. After Mr. Overstreet hung up the phone, the FBI Agent asked him about the call. Mr. Overstreet then informed the agent that he had become involved with Sheriff Long during Mr. Long's campaign for sheriff. According to Mr. Overstreet, Mr. Long had asked for Mr. Overstreet's assistance with black voters in Hamilton County. Mr. Overstreet, a black minister who operated a funeral home, agreed to work for Mr. Long in his campaign. Mr. Overstreet agreed to cooperate with the FBI in investigating Mr. Long, and placed a return phone call to Mr. Long which was monitored by the FBI. Mr. Long informed Mr. Overstreet that he needed to get his money from the Indian store owners.
. . . .

17. The investigation showed that Mr. Long believed he had been promised $50,000 in campaign contributions from convenience store owners who were a loose confederation of ethnic Indian store owners. He had only received about $12,000 of this campaign promise, and he was now interested in collecting the remainder of the 'debt' even though the campaign was over. . . .

Sealed PSR, revised 11/12/08 at 6-7.

The Sealed Plea Agreement states in pertinent part:

4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for the purpose of the defendant's guilty plea. They do not necessarily constitute all the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

- 4 -

William Horace Long, also known as "Billy" Long, was Sheriff of Hamilton County, Tennessee . . . elected . . . in August of 2006 . . . He resigned on February 5, 2008.

On April 3, 2007, the defendant traveled in his official Sheriff's Department vehicle with a cooperating witness ("CW") to a convenience store . . . The convenience store sold various items that had been shipped and transported in interstate commerce, including beer and cigarettes. Once inside the store, the defendant and the store owner met in a back storeroom where the defendant informed the store owner that he and other Indian store owners owed the defendant the remainder of a promised $ 50,000 campaign contribution. . . . All parts of the meeting[s] . . . .were recorded by audio/video recording devices hidden on the person of the CW.

Thereafter, the FBI was able to introduce two undercover agents posing as representatives of the store owners interested in obtaining the defendant's protection. Beginning on or about April 16, 2007 and continuing until on or about December 14, 2007, the Sheriff accepted 12 payments totaling $17,400, representing what he was told were payments from the aforementioned store owners to protect their video poker business, as well as other illegal activities such as selling precursor chemicals for methamphetamine. . . .

Beginning in November 2007, the CW advised the defendant that he was involved in laundering money for drug traffickers. The CW asked for the defendant's permission and assurance that the defendant would cover for the CW. Beginning on December 3, 2007, and continuing until February 2, 2008, *the Sheriff accepted five cash payments totaling $10,550*, representing his payoff from the CW, acting at the direction of the [FBI] and [IRS] who represented to the defendant that he had laundered $525,000 in drug trafficking proceeds. . . .

[lists six cash payments totaling $10,550]
. . . .

During the course of the CW's discussions with the defendant concerning the money laundering, the CW expressed concern that he did not have any protection while transporting the drug proceeds. The defendant offered to provide the CW with "something" and on December 20, 2007, while at the CW's office, the defendant gave the CW a loaded, .32 caliber . . . revolver. At the time he gave the pistol to the CW, the defendant knew that the CW was a convicted felon and prohibited by law from possessing a firearm. . . .

> *On February 2, 2008*, the defendant traveled to the CW's business in Chattanooga. At the time, the CW was preparing to load into a car *10 kilograms* of cocaine hydrochloride, a schedule II controlled substance, contained in an Amstel beer box and wrapped in Mexican newspaper. The defendant knew the contents of the box contained cocaine. The defendant, nevertheless, picked up the cocaine (which was actual cocaine supplied by the [DEA] after chemical analysis to the [FBI]) and loaded it into the CW's car. The CW explained to the defendant that he was going to drive the car to a drop, leave the car with the cocaine in it, and pick up their payment for the earlier laundering of purported drug money to Mexico. The defendant expected to split $40,000 with the CW, representing $4,000 per kilogram of cocaine. The CW asked the defendant to follow him to within a couple of blocks of the drop, wait at a nearby parking lot, pick him up after the CW dropped off the car and return with the CW to the CW's business.

> Upon their return to the CW's business, the defendant received $20,000 from the CW, representing the defendant's share in a cocaine transaction involving ten kilograms of cocaine which the CW had shown the defendant on January 24, 2008, and which the CW advised the defendant he was transporting at the request of drug traffickers. During this meeting, which was recorded by an FBI installed audio and video recording system, the CW also paid the defendant $4,000 in United States currency previously provided by and photocopied by the FBI. The CW represented the $4,000 to be approximately one-half of the 4% fee which the CW claimed he charged the Mexican drug trafficking organization for concealing and shipping $200,000 in drug proceeds to Mexico during the previous week. The purpose of the financial transactions between the defendant and the CW was to promote the laundering of the purported drug trafficking proceeds to Mexico.

R. 96, Def.'s Sealed App. vol. 3 of 3, at 156-161 (emphasis added).

### III. <u>Long's Challenge to Calculation of Base Offense Level for Drug Quantity</u>

The PSR calculated a base offense level of 34 for the drug count:

70. Base Offense Level: [] According to the Offense Conduct section, this defendant's criminal activity involved possession with intent to distribute 46.5 [*sic* 46.25] kilograms of cocaine hydrochloride. The offense level specified in the Drug Quantity Table under USSG § 2D1.1(c)(3) sets a base offense level of 34 for 15 to 50 kilograms of cocaine hydrochloride.

The district court agreed with the PSR's attribution of 46.25 kilograms of cocaine to Long, based on three separate quantities: 1) 26.25 kilos, a fictional amount derived from the $525,000 of drug-trafficking money Overstreet claimed to have laundered, from which Long received a 2% share ($10,500); 2) 10 kilos Overstreet showed Long on January 24, 2008; and 3) 10 kilos Overstreet asked Long to carry, and Long did carry, to a car of Overstreet's on February 2, 2008. To the base offense level of 34 two levels were added for having provided Overstreet with a gun for protection, and two levels for abuse of a position of public trust, for an adjusted offense level of 38.

**A**

As he did in the district court, Long challenges the attribution of the 26.25 kilos and inclusion of the 10 kilos present on January 24, 2008. He does not challenge the inclusion of the 10 kilos he carried on February 2, 2008.[2] Long acknowledges that the district court sentenced him on the drug count below the Guidelines range to the statutory minimum, 120 months. However, Long correctly argues that the base offense level for drug quantity becomes important if this court finds that the offense level for the money laundering count was improperly calculated. Def.'s Reply Br. at 4 & n.1.

This court "will not set aside a district court's determination of drug quantity attributable to the defendant for sentencing purposes unless the determination was clearly erroneous." *United States v. Vasquez*, 560 F.3d 461, 471 (6th Cir. 2009). The government must prove the amount to be attributed to a defendant by a preponderance of the evidence. *Id.*

_____

[2]*See* Def.'s Reply Br. at 3. Long contends that the FBI chose that amount to be present–an amount that carried a mandatory minimum sentence. Long's objection to the PSR similarly stated that "the Court should consider that even that [February 2, 2008 10-kilogram] amount was selected by the Government." Def.'s Obj. to PSR, §§ XVI, XXII.

U.S.S.G. § 2D1.1, application note 12 provides:

Types and quantities of drugs not specified in the count of conviction [in this case, possession with intent to distribute 5 or more kilograms of cocaine] may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance . . .

If the offense involved both a substantive drug offense and an attempt or conspiracy (e.g., sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.

In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance – actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of the offense. In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that the defendant did not intend to provide or purchase, or was not reasonably capable of providing or purchasing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that the defendant did not intend to provide or purchase or was not reasonably capable of providing or purchasing.

U.S.S.G. § 1B1.3 provides:

**Relevant Conduct (Factors that Determine the Guideline Range)**

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)   (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct of common scheme or plan as the offense of conviction.

U.S.S.G. § 1B1.3(a).

A district court's determination that certain activity qualifies as "relevant conduct" under § 1B1.3(a)(2) involves the application of law to fact and is reviewed *de novo*. *United States v. Maken*, 510 F.3d 654, 657 (6th Cir. 2007) (citing *United States v. Shafer*, 199 F.3d 826, 830 (6th Cir. 1999)). In this circuit, a sentencing court "may not include conduct in its sentencing calculation pursuant to § 1B1.3(a)(2) unless the conduct at issue amounts to an offense for which a criminal defendant could potentially be incarcerated." *Shafer*, 199 F.3d at 830; *see also United States v. Anthony*, 280 F.3d 694, 698 (6th Cir. 2002) (district court bound by *Shafer* to factor into its sentencing analysis only that conduct that could lead to a criminal conviction resulting in imprisonment).

**B**

Long's objections to the PSR's calculation of the drug quantity base offense level specifically argued that under *Shafer*,"the conduct that the PSR is asking the Court to consider as relevant conduct does not involve an offense that could lead to a criminal conviction." *See* Def.'s Obj. to PSR, numbered XIX ¶ 54, and XXII (¶ 66, adopting ¶ 54). Nonetheless, neither the Government or the district court addressed this issue.[3]

---

[3]The addendum to the PSR, which responded to Long's objections, skirted the issue, stating:

The defense objection to the calculation of the applicable drug amount is based on three different premises:

1. The 10 kilograms contained in the box carried by Mr. Long are the only actual drugs in the case and should be the only amount used to establish the base offense level;

2. There is no way to fairly estimate the amount of cocaine equivalent to $525,000 (the amount of money laundered in the drug trafficking operation) because this " . . . was a created crime . . . ," and the government can set any price they want for the drugs. The defense cites case law regarding the estimation of a drug amount based upon a monetary amount; and,

3. The defense submits that *the base offense level for money laundering should not be based upon the drug amount as the relevant conduct (drug trafficking) as alleged in the [PSR] because it is not applicable as there was no actual underlying offense (as the drug trafficking was a crime created by the government), and also that the amount of laundered funds should only refer to the amount of money that Mr. Long kept for himself, which the defendant submits is $10,550.*

Probation Officer's Response: The base offense level that impacts the defendant's guideline range in this case is based upon the amount of cocaine hydrochloride involved in the offense. That amount is based upon the quantity of actual cocaine in the offense, as well as an amount of cocaine estimated based upon the amount of money involved in the offense, money believed by the defendant to be either the proceeds [of] drug trafficking or payments for cocaine. The heart of the defendant's

Long also raised in his objections to the PSR that no criminal defendants could potentially

> objection involves the issue of relevant conduct. The defendant denies any responsibility under relevant conduct because the actual drug trafficking crime was "created by the government" and did not really exist. However, entrapment is not an issue in determining the defendant's responsibility in the offense and any relevant conduct. Mr. Long believed that the money that was being shipped was the proceeds from drug trafficking, and he took actions including accepting his "cut" of the payment, as well as counting the money shipments, discussing the method of shipping the money, and assisting in one delivery of cocaine which included picking up a payment.
>
> Mr. Long took part in a jointly-undertaken criminal activity, and is responsible for all reasonably foreseeable acts in furtherance of that activity. Mr. Long was well aware of the details of the drug money laundering scheme and knew the scope of the activity based upon his conversations with the CW, and the payments he received for his role in the offense. Using only Mr. Long's payments for his role in the drug money laundering scheme does not capture the scope of the crime. The scope of the crime is captured only by the entire amount of money laundered, $525,000, especially considering Mr. Long's knowledge that the amount of money was indeed the amount involved in the offense. As a lifelong law enforcement officer, Mr. Long had better knowledge than most in determining the scope of such a crime based upon the amount of money he knew to be involved and the drugs that the amount represented.
> . . . .
> The defendant is convicted of money laundering, as well as drug trafficking, and using the base offense level as calculated for the drug trafficking offense, pursuant to the provisions of USSG § 2S1.1(a)(1), is warranted, pursuant to the provisions of USSG § 1B1.3, Relevant Conduct. The argument that there is no underlying offense, as this was crime created by the government, is belied by the fact that Mr. Long has pled guilty to a drug trafficking crime. Additionally, the defense again argues the amount of money involved in the offense should only be the amount that Long accepted as payment, and is charged with in the Indictment, $10,550. However, this does not adequately capture the scope of the offense, which is more accurately reflected by the amount of money actually laundered, the actual payment or proceeds of the drug trafficking, $525,000.
>
> No change is made to the [PSR] in the area of drug amount or laundered funds in relation to drug trafficking.

PSR Addendum at 2-3.

be incarcerated for the money laundering and drug trafficking other than him, citing *United States v. Hayden*, 68 F. App'x 530, 532 (6th Cir. 2003) (noting that "it is settled that proof of an agreement between a [lone] defendant and a government agent or informer is not sufficient to support a conspiracy conviction," citing *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984)).

The district court overruled Long's objection to the calculation of the base offense level for drug quantity, addressing neither *Shafer* nor *Hayden*. The district court made no findings identifying an offense or offenses other than conspiracy for which Long could potentially be incarcerated, and the Government failed to identify such offenses below. The closest the district court came to identifying an offense for which Long could potentially be incarcerated was when it stated: "But, you know, it would have been a conspiracy but for the fact that Mr. Overstreet was a government informant. . . I mean, it would have been. And Mr. Long at all times thought it was a joint criminal enterprise. And . . . as far as he knew, he and Mr. Overstreet were jointly engaged in that criminal enterprise." *See* R. 117/Sentencing Tr. at 22-33.

The Government cited no authority below, nor does it on appeal, supporting that Long's thinking or believing that he was jointly engaged in a criminal enterprise with Overstreet, who in reality was a government agent, constitutes an offense for which Long could potentially be incarcerated, or that Long's so thinking or believing could be properly considered as "relevant conduct" under § 1B1.3(a)(2). *Shafer*, 199 F.3d at 830.

In *Maken*, 510 F.3d at 659-60, this court held that the district court's failure to make a specific finding identifying whether the defendant's conduct amounted to an offense that could result

in the defendant's incarceration was harmless error *under the circumstances that the government had identified the statutes violated* (failure to file Ohio income and sales taxes) in its objection to the PSR, and the defendant did not dispute that he had failed to pay the taxes. This court took judicial notice of the Ohio tax provisions and held that the district court's failure to make specific findings was harmless error, noting it "had no reason to believe that resentencing would alter the length of the sentence imposed." *Id*. at 660. Here, the Government identified no such statute.

*Maken* discussed *United States v. Harris*, 200 F. App'x 472 (6th Cir. 2006), in which this court concluded that, under *Shafer*, the district court erred by including as relevant conduct activity which it had not determined amounted to an offense for which a defendant could potentially be incarcerated:

> the district court made no finding as to whether Harris's nonpayment of state, local, and FICA taxes "amounts to an offense for which a criminal defendant could potentially be incarcerated," *Shafer*, 199 F.3d at 831, so it erred by including that conduct as relevant conduct for tax-loss purposes. On remand, the district court must decide this issue in the first instance.

200 F. App'x at 497.

## C

Because neither the Government nor the district court identified an offense for which Long could potentially be incarcerated in association with the 36.25 kilograms attributed to him (the January 24, 2008 ten kilograms and the fictional 26.25 kilograms calculated from the $525,000 amount Overstreet represented as laundered funds), the court erred by including 36.25 kilograms of cocaine as relevant conduct. *Maken*. 510 F.3d at 660; *Harris*, 200 F. App'x at 497.

## IV - **Calculation of Base Offense Level for Money Laundering**

The provision of the money-laundering statute to which Long pleaded guilty, 18 U.S.C. § 1956(a)(3)(A), provides:

> (3) Whoever, with the intent --
>    (A) to promote the carrying on of specified unlawful activity;
> conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both. For purposes of this paragraph and paragraph (2), the term "represented" means any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section.

The district court applied U.S.S.G. § 2S1.1(a)(1), as the PSR recommended. The PSR grouped the six money-laundering counts and applied section 2S1.1(a)(1). Long objected to application of section (a)(1), arguing that section (a)(2) should apply.

The PSR states:

Counts Twenty through Twenty-Five - Money Laundering

57.    Explanation of Grouping Decision: Counts Twenty through Twenty-Five are grouped under USSG § 3D1.2(d) when the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or when the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior. [Long did not object to this grouping.]

58.    Base Offense Level: The . . . Guideline for a violation of Title 18 U.S.C. § 1956(a)(3)(A) is found in USSG § 2S1.1(a)(1) and instructs to use the offense level for the underlying offense from which the laundered funds were derived if the defendant committed the underlying offense or would be accountable for the underlying offense under Relevant Conduct. In this case, the funds laundered were derived from drug trafficking, and the defendant would be accountable for that conduct under Relevant Conduct. Pursuant to USSG §

> 2D1.1(c)(3), the offense level for the underlying offense is 34, based upon
> $525,000 converted to 26.25 kilograms of cocaine hydrochloride.

PSR at 14-15 (emphasis added).

## A

Section§ 2S1.1(a) of the Guidelines provides:
<u>Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property
Derived from Unlawful Activity.</u>

(a) Base Offense Level:

> (1) The offense for the underlying offense from which the laundered
> funds were derived, if (A) the defendant committed the underlying
> offense (or would be accountable for the underlying offense under
> subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the
> offense level for that offense can be determined; or

> (2) 8 plus the number of offense levels from the table in § 2B1.1
> (Theft, Property Destruction, and Fraud) corresponding to the value
> of the laundered funds, otherwise.

The Application Notes provide in pertinent part regarding subsection (a)(1):

> (B) <u>Defendants Accountable for Underlying Offense</u>. *In order for subsection (a)(1)
> to apply, the defendant must have committed the underlying offense or be
> accountable for the underlying offense under § 1B1.3(a)(1)(A)*. The fact that the
> defendant was involved in laundering criminally derived funds after the commission
> of the underlying offense, without additional involvement in the underlying offense,
> does not establish that the defendant committed, aided, abetted, counseled,
> commanded, induced, procured, or willfully caused the underlying offense.

U.S.S.G. § 2S1.1 cmt. n.2(B) (emphasis added).

The Application Notes state regarding subsection (a)(2), which Long maintains should have

been applied:

(A) <u>In General</u>. – Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine.

U.S.S.G. § 2S1.1 cmt. n.3(A) (emphasis added).

Relevant Conduct is addressed in U.S.S.G. § 1B1.3(a)(1)(A), quoted *supra*.

**B**

Long argued below and argues on appeal that the PSR incorrectly applied section 2S1.1(a)(1) rather than (a)(2). He notes that under section (a)(2), the relevant conduct alleged in the PSR is not applicable, and the value of the laundered funds applies only to the $10,550 that he actually received.

Section 2S1.1(a)(1) requires that the defendant "committed the underlying offense (or would be accountable for the underlying offense under (a)(1)(A) of § 1B1.3 (Relevant Conduct))." U.S.S.G. § 2S1.1(a)(1). The defendant did not commit the underlying offenses that produced the money involved in the money laundering offense. The underlying offenses of drug trafficking were represented to have occurred by the government witness but in fact no underlying drug offenses ever did occur. Additionally, the defendant would not be accountable for the underlying offense as relevant conduct. . . .

The indictment in Counts 20 through 25 states that Long "did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property, represented by another person at the direction of a Federal official authorized to investigate and prosecute violations of this section, to be the proceeds of drug trafficking activity in violation of 21 U.S.C. §§ 841 and 846, that is money." The defendant had no involvement in the underlying offense, because there was no underlying offense that took place. The defendant only believed there was an underlying offense because the Government witness told the defendant that the money was from the sale of drugs by Mexican drug dealers. The defendant did nothing to "commit, aid, abet, counsel, command, procure, or willfully cause" the underlying offense, an offense that was a figment of the imagination.

The defendant would also not be accountable for the underlying offense under § 1B1.3(a)(1)(A) (Relevant Conduct). Two different types of conduct are consider[ed] relevant conduct under § 1B1.3(a) [quoted *supra*.]

. . . .

The defendant did not engage in any relevant conduct that would fall under (1)(A). The defendant was not involved in drug trafficking with Mexicans. There was no drug trafficking with Mexicans that was producing the money involved in the money laundering. The defendant was only informed about what was occurring by the government witness. The plea agreement provides that "the CW advised the defendant that [the CW] was involved in laundering money for drug traffickers. The CW asked for the defendant's permission and assurance that the defendant would cover for the CW." Because no offense was actually occurring, no acts or omissions by the defendant had any effect on any drug trafficking. Based on the above cited authority, the defendant submits that it is clearly error for the base offense level . . . of the PSR to be based on relevant conduct under § 2S1.1(a)(1). The correct base level offense would be calculated under § 2S1.1(a)(2).

Secondly, if § 2S1.1(a)(2) is applied, the defendant cannot be held responsible for the underlying conduct based on any actions by the Government witness or any actions that the Government witness told the defendant were occurring as relevant conduct. The Sixth Circuit held that

> [W]e believe the Sentencing Guidelines do not provide for the consideration of conduct under § 1B1.3(a)(2) unless that conduct involves an offense that could lead to a criminal conviction resulting in prison time. Accordingly, we now explicitly hold that a district court may not include conduct in its sentencing calculation pursuant to § 1B1.3(a)(2) unless the conduct at issue amounts to an offense for which a criminal defendant could potentially be incarcerated.

United States v. Shafer, 199 F.3d 826, 830-31 (6th Cir. 1999). The conduct that the PSR is asking the Court to consider as relevant conduct does not involve an offense that could lead to a criminal conviction. The Mexicans that were trafficking drugs and sending this money to the Government witness do not exist, and therefore [the defendant] could not ever be convicted of any offense.

. . . .

[] the defendant himself also could never be prosecuted for the underlying drug trafficking offenses responsible for producing the money that Overstreet alleged to have sent to Mexico because no conspiracy existed between the defendant or any Mexicans or the defendant and Overstreet.

. . . . [Additional cases discussed.]

Section (a)(2) of § 2S1.1 provides that the base offense level is "8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise." U.S.S.G. § 2S1.1(a)(2). The PSR alleges that the amount of money involved is $525,000. The defendant contends that the proper amount of money corresponding to the laundered funds is $10,550 – the amount that Long collected from the government witness. If the Court determines the amount is $525,000, the base offense level would be 8 plus 14, for a total of 22. If the Court determines the amount is $10,550, as the defendant contends, the base offense level would be 8 plus 4 for a total of 12.

The indictment does not allege that the defendant laundered $525,000. Count[s] 20 through 25 provide[] only that Long laundered the "money as set forth below," which included

| Count 20: | December 3, 2007 | $550 |
| Count 21: | December 14, 2007 | $1000 |
| Count 22: | December 20, 2007 | $2000 |
| Count 23: | January 18, [2008] | $1000 |
| Count 24: | January 24, 2008 | $2000 |
| Count 25: | February 2, 2008 | $4000 |

and totaled $10,550. [] The plea agreement provided that the defendant "accepted five trafficking proceeds." (Plea Agreement p. 6). . . .

Def.'s Obj. to PSR, § XIX.

## C

The Government did not address this issue below, nor does it on appeal.

Under *Shafer*, 199 F.3d 826, if § 2S1.1(a)(2) is applied, Long cannot be held responsible for the underlying conduct based on any actions by the Government witness or any actions that the Government witness told the defendant were occurring as relevant conduct. As mentioned, *Shafer* held that "a district court may not include conduct in its sentencing calculation pursuant to §

- 18 -

1B1.3(a)(2) [relevant conduct] unless the conduct at issue amounts to an offense for which a criminal defendant could potentially be incarcerated." 199 F.3d 830-31. In the instant case, the purported Mexicans that were trafficking drugs and sending money to Overstreet did not exist, and therefore could not be convicted of any drug offense. Nor could they be convicted of a money-laundering offense.[4]

Under *United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008),[5] on which Long relies, this Court observed that application of § 2S1.1(a)(1) "requires two conditions be met: (A) that the defendant is responsible for the underlying offense, either because she committed it or it is relevant conduct, as defined in § 1B1.3; and (B) that the base level of the underlying offense is determinable." *Id.* at 324.

---

[4]*Shafer* was relied on in *United States v. Alrub*, 160 F. Supp. 2d 988 (N.D. Ill. 2001), which held that the defendant's conduct with a confidential informant and government agents could not be included in a district court's sentencing calculation as relevant conduct:

> The court agrees with the Sixth Circuit's analysis [in *Shafer*]. Because it is uncontested that the only purported "relevant conduct" in which defendant engaged before January 23, 2000, was negotiation with the government agents for the purchase of the drugs that eventually led to the January 28, 2000, reverse sting, and because such conduct "could never lead to a criminal conviction" because one cannot criminally conspire with a government agent, the activities prior to January 23, 2000, cannot be considered "relevant conduct" under § 1B1.3.

*Alrub*, 160 F. Supp. 2d at 991.

[5]In *Anderson*, this court rejected the defendant's argument that her sentence was procedurally unreasonable based on arguments that included the same one Long makes – that the court improperly used § 2S1.1(a)(1) instead of (a)(2). Unlike the district court in the instant case, however, the district court in *Anderson* considered and ruled on that challenge. 526 F.3d at 322.

We conclude that the district court should have applied § 2S1.1(a)(2), rather than (a)(1). Application of (a)(1) requires that Long be responsible for the underlying offense either because he committed it or it is relevant conduct. *Anderson*, 526 F.3d at 324. The PSR calculated the base offense level of 34 based on the $525,000 figure Overstreet represented to Long, and converted that figure to 26.25 kilograms of cocaine hydrochloride. Other than as a conspiracy, which is precluded under *Pennell* and *Hayden*, Long could not have committed the underlying offense, i.e., money-laundered $525,000.

The district court's failure to identify conduct that could amount to an offense for which Long could potentially be incarcerated renders its inclusion of the $525,000/26.25 kilograms of cocaine as relevant conduct error. *Maken*. 510 F.3d at 660; *Harris*, 200 F. App'x at 497. Because the district court erred in calculating the drug-quantity and money-laundering base offense levels, and absent these errors Long's Guidelines range would drop, we vacate Long's sentence and remand for re-sentencing. On remand, the district court must apply U.S.S.G. § 2S1.1(a)(2).

## V

Long asserts that the district court erred in denying his motion to have Overstreet psychologically examined. Long asserts that such an examination "would have provided great insight into what effect Overstreet's manipulative personality had on Long's actions." Def.'s Br. at 58. Long asserts that such an examination could have provided the court with valuable insight as to the nature and circumstances of the offense and helped answer the court's question to Long at the plea hearing asking why Long did what he did. Unsealed Reply Br. at 18.

**A**

Long's motion in the district court argued that the examination was necessary "in order to determine if [Overstreet] is an antisocial personality or a psychopath and to determine if his personality style allows him to know a truth from a lie and allows him to understand an objective reality." R. 27 at 1. In supplements to his motion, Long submitted voluminous evidence regarding Overstreet, and argued that a psychological examination of Overstreet would help his claims of sentencing entrapment, sentencing manipulation, and outrageous conduct.

The Government noted below that the district court could take into account the evidence Long submitted in support of his motion in sentencing, without ordering a psychological evaluation

In a 10-page memorandum opinion, the district court discussed the claims of sentencing entrapment and manipulation, and outrageous conduct, and denied Long's motions, noting it was unable to locate authority in which a psychological evaluation of a cooperating witness had been ordered, and that Long's need to have Overstreet examined did not outweigh Overstreet's privacy, opportunity for harassment, and the possibility that such an examination would deter other witnesses. The district summarized the bases for its ruling:

> The Court has not been cited to, nor has it been able to locate, any precedent for the action sought by Mr. Long here. Even in the jurisdictions which have formally adopted and consistently applied the doctrines of sentencing entrapment, sentencing manipulation, and outrageous conduct, the Court cannot identify a single instance in which the psychological evaluation of a cooperating witness has been ordered. In fact, Mr. Long admits that his motion "may be a novel request at this stage of the proceedings" and that there is no precedent either in favor of or opposed to granting it. (Court Doc. 51 at 8.)

In sum, the Court finds that the relevance of any information that might result from a psychological evaluation of the government's cooperating witness would be, at best, of highly questionable value to the Court in fashioning an appropriate sentence in this case. Accordingly, the Court concludes that Mr. Long's need for a psychological evaluation of the cooperating witness does not outweigh the cooperating witness's privacy, the opportunity for harassment, and the possibility that an examination will hamper law enforcement by deterring witnesses from coming forward in the future. Mr. Long's Motion . . . is DENIED.

In a footnote, the district court noted:

Even were the Court to conclude that the balance tipped in favor of Mr. Long, there are substantial legal questions regarding whether the Court even *could* order a non-party witness to submit to a psychological examination. *United States v. Ramirez*, 871 F.2d 582, 584-85 (6th Cir. 1989) ("[T]he court cannot *order* a non-party witness to be examined by a psychiatrist. The most the court could do is condition such witness's testimony on a prior examination.")

R. 79 at 7-8 & n.4/Memorandum and Order filed 10/23/08.

**B**

This Court reviews evidentiary rulings for an abuse of discretion. *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001). Long does not explain on appeal how the district court abused its discretion. He simply asserts that the factors weighing against psychological evaluation did not overcome his need for the exam, that he filed his motion in good faith, and that there was no basis to believe that other cooperating witnesses would be deterred from coming forward if the motion were granted. Because the district court thoroughly considered Long's arguments, *see* R. 79, Long submitted no Sixth Circuit authority to support his motion, and he does not explain how the district court could have abused its discretion given the dearth of authority supporting his position, we affirm the court's denial of Long's motion.

**VI**.

For the reasons stated, we VACATE Long's sentence and REMAND for resentencing under

*United States v. Maken*, 510 F.3d 654, 657 (6th Cir. 2007), and *United States v. Shafer*, 199 F.3d

826, 830 (6th Cir. 1999).  On remand, the district court must apply U.S.S.G. § 2S1.1(a)(2) and may

not value the laundered funds at $ 525,000.[6]

---

[6]Given our disposition, we do not address Long's remaining issues on appeal: 1) that his sentence is unreasonable under *Booker*, 2) that the district court erred in failing to downwardly depart under § 5K2.0, and 3) and that the court erred in failing to find that the Government had unconstitutional motives in denying a § 5K1.1 motion for substantial assistance.