RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0087p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

─────────────────



UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 15-5578

RODNEY HENRY,

*Defendant-Appellant.*

─────────────────

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:12-cr-00217—William J. Haynes, Jr., Chief District Judge.

Decided and Filed:  April 8, 2016

Before:  SILER, COOK, and DONALD, Circuit Judges.

─────────────────

**COUNSEL**

**ON BRIEF:**  Isaiah S. Gant, Andrew C. Brandon, FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant.  Clay Lee, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

─────────────────

**OPINION**

─────────────────

SILER, Circuit Judge.  After pleading guilty to one count of selling a firearm to a convicted felon, in violation of 18 U.S.C. § 922(d)(1), and one count of intent to distribute and distribution of morphine, in violation of 21 U.S.C. § 841(a)(1), Rodney Henry was sentenced to fifty months' imprisonment followed by three years of supervised release, the first eighteen months of which is to be served in a halfway house.  Henry now challenges the terms of his sentence, arguing that the district court erred by (1) applying various provisions of the United

1

States Sentencing Guidelines ("Guidelines" or "USSG") related to firearms, (2) applying a Guidelines enhancement for obstruction of justice, and (3) imposing an eighteen-month term of confinement in a halfway house. Because the district court erroneously applied the § 2K2.1(b)(5) firearms-trafficking enhancement to Henry, and because a serious, unresolved issue exists as to whether his conduct satisfied the obstruction-of-justice enhancement's willfulness requirement, we **VACATE** Henry's sentence and **REMAND** for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2011, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Tennessee Bureau of Investigation ("TBI") began a joint investigation of Henry following a tip from a confidential informant ("CI"). At the behest of law enforcement, the CI, who had a prior felony conviction, approached Henry for the purpose of purchasing a 9mm pistol and twenty Percocet pills. On June 30, 2011, the CI and an undercover TBI agent travelled to Henry's residence to complete the transaction. The pills were not at the residence when they arrived, but the agent expressed interest in purchasing an AK-47 rifle from Henry. The TBI agent told Henry that he and the CI had prior felony convictions (though the agent, in fact, did not) and they would therefore be unable to register either the rifle or the pistol. On the first visit to Henry's residence, the CI purchased the pistol for $350.

After the initial meeting, the CI arranged for the undercover agent to purchase ten morphine pills and the rifle from Henry. On July 13, 2011, two weeks after the first transaction, the agent and the CI travelled back to Henry's residence to purchase the morphine pills and the rifle. Ultimately, the agent bought six pills containing morphine from Henry for $180 and the rifle for $950.

In 2012, a grand jury indicted Henry on one count of selling a firearm to a convicted felon, in violation of 18 U.S.C. § 922(d)(1), and one count of possession with intent to distribute and distribution of morphine, in violation of 21 U.S.C. § 841(a)(1). In December 2012, Henry was released on his own recognizance, subject to pretrial supervision and the condition, among others, that he submit to random drug testing. Henry immediately tested positive for hydromorphone and morphine, and he did not provide his pretrial services officer with a valid

prescription for those drugs.  However, the officer recommended that the court take no action.  In January and February 2013, Henry tested positive for morphine twice more.  As a result, the court scheduled a hearing to address whether to revoke Henry's bond.  After a number of continuances, the hearing was rescheduled to occur on June 6, 2013.

Henry failed to appear for the June 6 hearing.  His attorney suggested that Henry "may have been confused because counsel recently notified him of the date to which the trial had been rescheduled[,] and [Henry] might have believed that he did not need to appear on June 6, 2013."  The court determined that, "taking into account the possible explanations for [Henry]'s failure to appear," it would take no action and that Henry would remain on release with the conditions previously imposed.

Henry's pretrial services officer made several unsuccessful attempts to contact him.  Henry failed to submit his monthly reports for June and July 2013, and he failed to appear for a July meeting with his pretrial services officer.  Accordingly, the pretrial services officer determined that Henry had "virtually absconded from supervision."  The district court issued an arrest warrant on July 15, 2013, and Henry was ultimately arrested over a year later, on July 25, 2014.  He pleaded guilty in 2015 to both counts of the indictment.

The Presentence Investigation Report ("PSR") started with a base offense level of twenty under § 2K2.1(a)(4)(B) of the Guidelines because the AK-47 was a semiautomatic firearm capable of accepting a large-capacity magazine.  It applied a four-level increase for "trafficking" firearms under § 2K2.1(b)(5) because Henry "transferred a firearm to the [CI] and one firearm to the undercover [agent] when he had reason to believe that both individuals were convicted felons and their possession of the firearms would be illegal."  It enhanced Henry's offense level by four points under § 2K2.1(b)(6) because he possessed the rifle in connection with another felony offense—possession with intent to distribute and distribution of morphine, in violation of 21 U.S.C. § 841(a)(1).  The PSR also included a two-point enhancement for obstruction of justice under § 3C1.1 related to Henry's pretrial conduct.  This resulted in an adjusted offense

level of 30.[1]   After a three-level reduction for acceptance of responsibility, the PSR calculated Henry's total offense level at 27 and Criminal History Category II.  With these calculations, Henry's Guidelines' range was 78 to 97 months of imprisonment, followed by three years of supervised release.

Henry did not object to any of the PSR's factual findings, but he argued that the base level under § 2K2.1(a)(4)(B) and the enhancements under §§ 2K2.1(b)(5), 2K2.1(b)(6), and 3C1.1 should not apply.  The Government responded that Henry's conduct met the requirements for these provisions to apply and requested a sentence of 60 months of incarceration, followed by three years of supervised release, the first 18 months to be served on home confinement.

At the sentencing hearing, the TBI agent testified as to the events of June 30 and July 13, 2011.  Lisa Bryan, Henry's mother, also testified that Henry missed a court appearance in either June 2012 or June 2013 because she told him shortly before the hearing that she was unable to bring him to court due to a work conflict.

The district court overruled Henry's § 3C1.1 (obstruction of justice) objection, finding that he "d[id]n't show up multiple times and then d[id]n't show up after being told that if [he] fail[ed] to show up, there w[ould] be an arrest warrant issued."  The court determined that "the arrest warrant [was] issued," that "it [was] outstanding for almost a year," and Henry "apparently . . . d[id]n't tell anybody why he didn't show up on the day" of the hearing.

In ruling on Henry's § 2K2.1(a)(4)(B) (firearms) objection, the court found that the Government established that the rifle was capable of accepting a large-capacity magazine and that § 2K2.1(a)(4)(B) therefore provided the correct base offense level.

The district court also applied § 2K2.1(b)(5), finding that Henry "transported, transferred, or otherwise disposed of two or more firearms to another individual" and that Henry did not have to "sell two or more firearms to one person. . . . If he s[old] two or more firearms[,] and he s[old] them] to somebody else, then it's covered."

---

[1]Because the offense level for the drug charge was lower than for the gun charge, the PSR used the latter to calculate Henry's adjusted offense level.

Ultimately, the court agreed with the PSR that Henry's total offense level was 27 with Criminal History Category II, for a Guidelines range of 78 to 97 months of incarceration, followed by three years of supervised release. The court considered that Henry's conduct was "serious," but that the Guidelines may have overstated the seriousness of the offense, and that Henry had committed no prior felonies. In light of these conclusions, and the finding that Henry had "a serious addiction problem" and was likely "selling . . . weapons to finance his addiction," the court imposed a sentence of 50 months' imprisonment on each count, to be served concurrently, followed by three years of supervised release, the first 18 months of which were to be served in a halfway house. The court inquired as to whether there were any objections, and Henry's counsel responded that there were none that had not already been raised.

## DISCUSSION

On appeal, Henry claims that the district court erroneously applied several provisions of USSG § 2K2.1 to him related to firearms, and he challenges the district court's application of the obstruction-of-justice enhancement under § 3C1.1. Henry also argues that the district court's imposition of an eighteen-month term in a halfway house as a special condition of supervised release[2] was procedurally and substantively unreasonable.

### I.    *Firearm Provisions*

#### A.    Standard of Review

In reviewing the district court's calculation of a defendant's Guidelines sentencing range, including the application of enhancements under § 2K2.1, we review the district court's legal conclusions de novo and its factual findings for clear error. *United States v. Taylor*, 648 F.3d 417, 431 (6th Cir. 2011) (citing *United States v. Davis*, 372 F. App'x 628, 629 (6th Cir. 2010)). A district court's interpretation of a Guidelines provision presents a legal question subject to de

---

[2]While the district court's judgment is unclear in this respect, Henry's term in a halfway house can only be understood as a special condition of supervised release. At the sentencing hearing, the district court identified that Henry's time in a halfway house was a special condition of supervised release. When an oral sentence and a written judgment conflict, the oral sentence controls. *United States v. Denny*, 653 F.3d 415, 421 (6th Cir. 2011). Moreover, the Guidelines treat a term in a halfway house as "community confinement" and permit it only in two circumstances: as a condition of probation and as a condition of supervised release. *See* USSG §§ 5B1.1, 5B1.3, 5C1.1, 5D1.3, 5F1.1. Here, Henry did not qualify for probation because he was sentenced to a term of imprisonment and his Guidelines range fell within Zone D of the Sentencing Table. *See id.* §§ 5B1.1(b)(3), 5C1.1(f).

novo review. *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012) (citing *United States v. Anglin*, 601 F.3d 523, 526 (6th Cir. 2010)).

> B. The § 1B1.3(a) "Relevant Conduct" Standard

Henry's contention that his actions related to the rifle transaction do not constitute "relevant conduct" for purposes of the Guidelines provides the foundation for several of his arguments. Section 1B1.3(a) defines relevant conduct for the purposes of determining a defendant's base offense level, specific offense characteristics, and Chapter Three adjustments.

The Government argues that Henry's sale of the rifle to the undercover agent is related to his sales of the pistol and the morphine pills because they formed the same course of conduct or evinced a common scheme or plan. Section 1B1.3(a)(2) includes conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." To qualify as a "common scheme or plan," the relevant events must "be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *United States v. Hodge*, 805 F.3d 675, 683 (6th Cir. 2015) (quoting *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996)). Similarly, a defendant's actions form "the same course of conduct 'if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *Id.* (quoting USSG § 1B1.3(a)(2) cmt. n.9(B)).[3] "Three factors guide this analysis: 'the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.'" *Id.* (quoting *Hill*, 79 F.3d at 1481–82).

As the Government points out, the sale of the rifle and the sale of the pistol are connected in several ways: the sale of the rifle was discussed and planned during the sale of the pistol; both sales involved Henry, the undercover agent, and the CI; and both sales took place at the same location, Henry's residence. Moreover, the sales, which occurred two weeks apart, had at least some degree of temporal proximity. The connections between the sales of the rifle and the pills are the same or even stronger. They were, at least in part, planned at the same time, the same

---

[3]The 2014 Guidelines, which were in effect at the time Henry was sentenced, discussed the "same course of conduct" and "common plan or scheme" standards in Application Note 9 to USSG § 1B1.3. The 2015 edition of the Guidelines has moved this discussion, in substantially similar form, to Application Note 5(B).

parties were present at the sales, the same location was used, and the sales occurred contemporaneously. Therefore, the events qualify both as a common scheme or plan and as occurring in the same course of conduct.

Henry argues that his sale of the rifle was not criminal and therefore cannot subject him to an increased sentence. Although "relevant conduct" is not limited to actions that form the basis for a charge or a conviction, the conduct must nevertheless "amount[] to an offense for which a criminal defendant could potentially be incarcerated." *United States v. Catchings*, 708 F.3d 710, 720 (6th Cir. 2013) (alteration in original) (quoting *United States v. Maken*, 510 F.3d 654, 658–59 (6th Cir. 2007); *United States v. Shafer*, 199 F.3d 826, 831 (6th Cir. 1999)). Phrased differently, only conduct that is criminal in nature qualifies as relevant conduct under § 1B1.3.

However, the conduct surrounding Henry's sale of the rifle to the undercover agent violated 18 U.S.C. §§ 922(a)(1)(A) and 924(c)(1)(A). As relevant here, § 924(c)(1)(A) provides that

> any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such . . . drug trafficking crime . . . be sentenced to a term of imprisonment of not less than [five] years.

We have recognized that "the contemporaneous sale of drugs and a firearm in exchange for money constitutes carrying a firearm during and in relation to a drug trafficking crime under § 924(c)(1)(A)." *United States v. Rivera*, 502 F. App'x 554, 557 (6th Cir. 2012).

Henry does not dispute that the sale of the pills, to which he pleaded guilty, constitutes a "drug trafficking crime." Moreover, he does not claim that he did not "carry" the rifle; there is little doubt that he "convey[ed] or move[d] the firearm" with "personal agency and some degree of possession." *United States v. Kuehne*, 547 F.3d 667, 684 (6th Cir. 2008) (quoting *Muscarello v. United States*, 524 U.S. 125, 137 (1998)). Instead, he maintains that the gun and the drugs were unconnected and, presumably, that he did not carry the rifle "in relation to" the sale of the pills.

"The phrase 'in relation to' is expansive," *Smith v. United States*, 508 U.S. 223, 237 (1993), but it has limits. For a firearm to be carried "in relation to" a drug trafficking crime, "its presence or involvement cannot be the result of accident or coincidence." *Id.* at 238. "[T]he gun at least must 'facilitat[e], or ha[ve] the potential of facilitating,' the drug trafficking offense." *Id.* (second and third alterations in original) (quoting *United States v. Stewart*, 779 F.2d 538, 539 (9th Cir. 1985) (Kennedy, J.)). In making this inquiry, we "do[] not focus solely on the defendant's specific intentions as he engaged in the drug trafficking offense"; we examine the totality of the circumstances. *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999) (citing *United States v. Brown*, 915 F.2d 219, 226 (6th Cir. 1990)).

The presence of the rifle during the sale of the pills was not the result of an accident or coincidence. The agent and Henry agreed prior to the sale of the pills that the agent would also purchase the rifle at the same time; thus, the parties contemplated that the rifle would be present during the drug offense. *See Rivera*, 502 F. App'x at 557 (finding that no accident or coincidence occurred when a CI "specifically requested to purchase a firearm and [the defendant] brought one to him").

Henry contends, however, that the sale of the firearm and the sale of the drugs were unrelated because "all sales would have proceeded independently," defeating a so-called "sweetening the pot" theory of liability. We have recognized that a firearm can be used to "sweeten the pot" during a drug transaction when a drug purchaser "offer[s] to purchase not only drugs, but other illegal goods" to persuade "the drug seller to take the risks inherent in selling contraband." *Id.* at 557 (quoting *United States v. Lipford*, 203 F.3d 259, 267 (4th Cir. 2000)). Henry maintains that he did not need persuading to sell the pills to the agent because he agreed to the narcotics sale *before* agreeing to sell the rifle.

This argument is unavailing for two independent reasons. First, the fact that the sales were separately negotiated and may have been separately paid for—the record is inconclusive on this front—does not prevent them from "essentially amount[ing] to a single transaction" and therefore being related. *United States v. Timmons*, 283 F.3d 1246, 1251–52 (11th Cir. 2002); *see also Rivera*, 502 F. App'x at 557 (citing *Timmons* with approval). Second, and more importantly, "sweetening the pot" is not necessarily a one-way street. Even accepting *arguendo*

Henry's claim that he was not motivated, even in part, to follow through with the drug transaction by the prospect of also selling the rifle, his agreement to sell the gun can be understood as an attempt to shore up the agent's drug purchase. That is, Henry's account of the transaction supports a finding that he agreed to sell the rifle to ensure the agent did not purchase his narcotics from another source. The totality of the circumstances therefore suggests that Henry carried the firearm in relation to a drug offense, making § 924(c)(1)(A) applicable. Accordingly, we need not address the much closer issue of whether Henry's conduct falls under § 922(a)(1)(A), which imposes criminal liability on individuals "engag[ing] in the business of importing, manufacturing, or dealing in firearms" without a license.

Nevertheless, Henry also maintains that the Government was required to—but did not—identify the statute that it relied on in determining that his conduct surrounding the rifle was criminal in nature and that the Government never stated to the district court that this conduct violated §§ 922(a)(1)(A) or 924(c)(1)(A). Indeed, when a defendant argues that proposed "relevant conduct" was not criminal in nature, the Government should identify the statute that the conduct violates. *United States v. Grayer*, 625 F. App'x 313, 315 (6th Cir. 2015) (citing *Catchings*, 708 F.3d at 721; *United States v. Schaefer*, 291 F.3d 932, 938–41 (7th Cir. 2002); *United States v. Dickler*, 64 F.3d 818, 831 (3d Cir. 1995)). But Henry's claim that the Government did not put him on notice that his conduct related to the rifle violated §§ 922(a)(1)(A) and 924(c) is inaccurate. In response to Henry's sentencing memorandum, the Government explicitly stated that it was relying on §§ 922(a)(1)(A) and 924(c)(1)(A) in "classifying [Henry]'s conduct as criminal." Moreover, because the Government correctly indicated that Henry violated § 924(c)(1)(A), the fact that the district court did not make a specific finding of such violation constitutes harmless error under the circumstances. *See United States v. Long*, 457 F. App'x 534, 542 (6th Cir. 2012); *Maken*, 510 F.3d at 660.

Therefore, Henry's sale of the rifle was properly considered as relevant conduct under § 1B1.3.

C.      The § 2K2.1(a)(4)(B) "Large-Capacity Magazine" Provision

Henry challenges the district court's reliance on USSG § 2K2.1(a)(4)(B), which provides for a base offense level of 20 if

> the (i) offense involved a (I) semiautomatic firearm that is capable of accepting a large capacity magazine; or (II) firearm that is described in 26 U.S.C. 5845(a); and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense; (II) is convicted under 18 U.S.C. 922(d); or (III) is convicted under 18 U.S.C. 922(a)(6) or 924(a)(1)(A) and committed the offense with knowledge, intent, or reason to believe that the offense would result in the transfer of a firearm or ammunition to a prohibited person.

In turn, Application Note 2 to § 2K2.1 defines a "semiautomatic firearm that is capable of accepting a large capacity magazine" as

> a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

The district court found that the Government established that the rifle was capable of accepting a large-capacity magazine. Accordingly, it applied § 2K2.1(a)(4)(B) to Henry.

On appeal, Henry contends that he was only indicted for selling the pistol, not the rifle, and, therefore, his "'offense' did not 'involve' . . . a weapon" capable of accepting a large-capacity magazine. This position lacks merit. The Guidelines define "offense" as "the offense of conviction and all relevant conduct under § 1B1.3." USSG § 1B1.1 cmt. n.1(H); *see also United States v. Weiner*, 518 F. App'x 358, 363 (6th Cir. 2013). And, as discussed above, Henry's actions related to the rifle qualify as "relevant conduct" within the meaning of § 1B1.3. Moreover, while we have never previously considered § 2K2.1(a)(4)(B)'s large-capacity magazine enhancement, the Eleventh Circuit has persuasively applied the provision on the basis of a defendant's relevant conduct. *See United States v. Langford*, 533 F. App'x 948, 951–52 (11th Cir. 2013) (per curiam). Therefore, the district court did not err in enhancing Henry's Guidelines range under § 2K2.1(a)(4)(B).

D.      The § 2K2.1(b)(6) "In Connection With" Enhancement

Henry also claims that the district court erroneously applied USSG § 2K2.1(b)(6), which increases a defendant's base offense level by four points if he "used or possessed any firearm or ammunition in connection with another felony offense." This enhancement applies "if the firearm or ammunition facilitated, or had the potential of facilitating, another felony offense." USSG § 2K2.1 cmt. n.14(A); *see also Taylor*, 648 F.3d at 432.[4] In drug trafficking cases, § 2K2.1(b)(6) generally applies when "a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." USSG § 2K2.1 cmt. n.14(B); *see also United States v. Sweet*, 776 F.3d 447, 450 (6th Cir. 2015). However, the Government must demonstrate "a nexus between the firearm and an independent felony," meaning that the possession of the firearm cannot be "merely coincidental." *Taylor*, 648 F.3d at 432 (quoting *United States v. Angel*, 576 F.3d 318, 321 (6th Cir. 2009); *United States v. Ennenga*, 263 F.3d 499, 503 (6th Cir. 2001)). Thus, the firearm must have "served some purpose in relation to the other offense, such as embolden[ing] the defendant in committing it." *United States v. Fritts*, 557 F. App'x 476, 486 (6th Cir. 2014) (alteration in original) (quoting *United States v. Jones*, 470 F. App'x 477, 480 (6th Cir. 2012)). "The burden to show a nexus between the firearm and the other felony is not onerous." *Id.*

In applying § 2K2.1(b)(6) to Henry, the district court relied on *United States v. Davis*, 372 F. App'x 628 (6th Cir. 2010). In *Davis*, we considered whether the § 2K2.1(b)(6) enhancement applied to a defendant who made four sales to a cooperating witness on four separate days. *Davis*, 372 F. App'x at 628. At the first sale, the defendant provided the witness with ten pills; at the second, thirty pills; at the third, thirty-one pills and a shotgun; and, at the fourth, another shotgun. *Id.* The court found that § 2K2.1(b)(6) covered this scenario because "the sale of a firearm in conjunction with drugs may 'sweeten the pot,' and thus has the potential to facilitate a drug deal." *Id.* at 630 (citing *United States v. Bullard*, 301 F. App'x 224, 227 (4th Cir. 2008); *United States v. McGill*, 139 F. App'x 201, 202 (11th Cir. 2005)). Likewise, "the sale of a firearm together with prescription drugs goes beyond coincidental simultaneous

---

[4]The "in connection with" standard is the same as or substantially similar to § 924(c)(1)(A)'s "in relation to" standard. *See United States v. Moore*, 239 F. App'x 137, 140 (6th Cir. 2007).

possession. The joint sale suggests that the [firearm] facilitated, or at least had the potential to facilitate, the drug deal." *Id.* The *Davis* court also noted that the presence of the firearm need not increase the risk of violence for the enhancement to apply: "the precedent of this and other circuit courts, together with the Guidelines commentary, suggests that § 2K2.1(b)(6) is broad enough to cover the sale of firearms as part of a drug deal, even if there is no increased risk of violence." *Id.*

Henry argues that the district court erred because the rifle did not facilitate or have the potential to facilitate his drug offense. He claims that the June 30 meeting "demonstrate[ed] that the pills were entirely unrelated to the sale of the firearm" because he sold the pistol to the CI even without having pills to sell. Henry recognizes that the agent negotiated the purchase of the rifle, agreed to buy pills at a later date, and "purchased six pills and the assault rifle" when he returned on July 13. Nonetheless, Henry maintains that "there was no connection between" the sale of the pills and the sale of the rifle because the sale of the gun "would have gone forward without the presence of the pills." According to him, "the two sales were independently agreed upon and had nothing to do with one another."

Far from establishing that the sales were unconnected, the very facts that Henry recites demonstrate a nexus between the rifle and the morphine pills. The sales of the gun and the drugs were negotiated, at least in part, during the same meeting, and they occurred contemporaneously. As we noted in *Davis*, the joint sale of drugs and firearms does not constitute "coincidental simultaneous possession." 372 F. App'x at 630. And, as discussed above, the fact that the sales of guns and drugs are negotiated as separate items does not prevent them from "essentially amount[ing] to a single transaction." *Timmons*, 283 F.3d 1246, 1251–52.[5]

Even accepting *arguendo* Henry's claim that each sale would have proceeded independently if the other had fallen through, his position lacks merit. But-for causation is not the applicable standard under § 2K2.1(b)(6); all that is required is that the firearm "facilitated, or had the potential of facilitating, another felony offense." USSG § 2K2.1 cmt. n.14(A). In the

---

[5]*Timmons* considered whether a defendant carried a firearm "in relation to" a drug transaction for purposes of § 924(c)(1). 283 F.3d at 1251. As discussed *supra*, however, § 2K2.1(b)(6)'s "in connection with" language has been interpreted to have the same meaning as "in relation to" under § 924(c)(1). Therefore, *Timmons* is persuasive authority here.

context of criminal law, to "facilitate" generally means "[t]o make the commission of []a crime[] easier." *Black's Law Dictionary* (10th ed. 2014). So, to satisfy § 2K2.1(b)(6) under these circumstances, Henry's use or possession of the rifle must have had the potential to make the sale of the pills easier. As previously discussed, Henry's agreement to sell the rifle had the potential to ensure that the pills were not purchased from a competitor. Additionally, a joint sale such as this one can be expected to reduce the transaction costs attendant to each sale—e.g., by requiring less time per sale. For both of these reasons, the rifle had at least the potential to facilitate Henry's sale of the pills.

Henry argues that he only sold "a personal-use" quantity of drugs, while the defendant in *Davis* sold a "distribution quantity." While Henry is correct that the addition of a gun to the sale of a large quantity of drugs could "sweeten the pot" by providing a tangible benefit to a fledgling drug dealer, that is not the only circumstance where this rationale applies. The principle also covers several circumstances that do not require a distribution quantity of drugs. Sweetening-the-pot occurs when firearms are added to a drug sale under circumstances that could cause the seller to believe that he would obtain a greater profit with a relatively low increase to the risk of detection by law enforcement. *See Rivera*, 502 F. App'x at 557. This incentive may even be stronger as drug quantities *decrease* because the expected profit without the firearms would likely be lower with smaller amounts of drugs. Therefore, the joint sale of drugs and firearms has the potential to make a drug transaction easier—thus facilitating it. Accordingly, the district court did not err in applying the § 2K2.1(b)(6) enhancement.

E.     The § 2K2.1(b)(5) "Trafficking" Enhancement

Henry also maintains that the district court should not have enhanced his sentence based on USSG § 2K2.1(b)(5), which provides for a four-level increase to the base offense level "[i]f the defendant engaged in the trafficking of firearms." Application Note 13(A) to § 2K2.1 clarifies that, "regardless of whether anything of value was exchanged," the trafficking enhancement applies

if the defendant—

(i)      transported, transferred, or otherwise disposed of two or more firearms to another individual, or received two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual; and

(ii)      knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—

(I)      whose possession or receipt of the firearm would be unlawful; or

(II)      who intended to use or dispose of the firearm unlawfully.

*See also United States v. Freeman*, 640 F.3d 180, 188 (6th Cir. 2011).

At sentencing, the district court applied § 2K2.1(b)(5) over Henry's objection that he did not transfer more than one firearm to any single individual.  On appeal, Henry raises two arguments as to why the district court should not have applied the trafficking enhancement.  First, he contends that the sale of the rifle was not relevant conduct and that, in any event, the undercover agent was not a felon, so he could legally possess the firearm.  As discussed in detail above, Henry's actions related to the rifle constituted relevant conduct.  Additionally, the agent need not have *actually* been a felon for § 2K2.1(b)(5) to apply.  The Guidelines merely require Henry to have "had reason to believe" that the agent's "possession or receipt of the firearm would be unlawful."  USSG § 2K2.1 cmt. n.13(A)(ii).  Under 18 U.S.C. § 922(g)(1), an individual convicted of a felony offense is prohibited from receiving a firearm that has been shipped or transported in interstate commerce.  There is no dispute that the undercover agent informed Henry that he had been convicted of a felony and could not, therefore, purchase a firearm lawfully.  While we have never had the opportunity to consider the issue, the Eleventh Circuit has found that § 2K2.1(b)(5) applies under similar circumstances.  *See United States v. Fields*, 608 F. App'x 806, 813 (11th Cir. 2015); *see also United States v. Sacus*, 784 F.3d 1214, 1218 (8th Cir.) (affirming, without addressing the issue, a sentence applying § 2K2.1(b)(5) to a defendant who sold firearms to an undercover agent who claimed he had multiple felony convictions), *cert. denied*, 136 S. Ct. 348 (2015).  This circuit and others have applied the same principle under analogous circumstances, finding that agents' or officers' intent is irrelevant when they told a defendant that they would use a firearm in an unlawful manner.  *See, e.g., United States v. Jenkins*, 528 F. App'x 483, 486 (6th Cir. 2013); *United States v. Tavares*,

427 F.3d 122, 125–26 (1st Cir. 2005); *United States v. Inglese*, 282 F.3d 528, 539 (7th Cir. 2002).

Second, Henry argues that the trafficking enhancement should not apply because he did not "sell multiple weapons *to one person*" as the text of Application Note 13(A) contemplates. He reasons that the text of the note is clear; the enhancement applies to individuals that transfer multiple firearms to a single individual.

In considering the Guidelines, including the application notes, we apply the traditional canons of statutory interpretation. *See United States v. Babcock*, 753 F.3d 587, 591 (6th Cir. 2014); *see also United States v. Banks*, 776 F.3d 87, 91 (2d Cir. 2015). "The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *United States v. Jackson*, 635 F.3d 205, 209 (6th Cir. 2011) (quoting *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000)). In determining whether language is clear, we give "terms the ordinary meaning that they carried" when the provision was put into effect. *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 512 (6th Cir. 2015) (citing *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014)).

Here, the starting point of the analysis is the term "trafficking." Because the Guidelines define "trafficking," however, we look to that definition. *See Sandifer*, 134 S. Ct. at 876. This leads us to Application Note 13(A), which defines trafficking, in relevant part,[6] as "transferr[ing] . . . two or more firearms to another individual." The parties' disagreement centers on the phrase "another individual"—whether it means one individual or whether it can mean multiple individuals.

In its common adjectival meaning, "another" indicates that the noun that follows it is singular. *See* Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/another (last visited Apr. 7, 2016) (defining "another" as "some other" or "being one more in addition to one or more of the same kind"); Oxford English Dictionary Online,

---

[6]The district court briefly discussed Application Note 13(A)'s language including in the definition of "trafficking" the act of "receiv[ing] two or more firearms with the intent to transport, transfer, or otherwise dispose of firearms to another individual." However, the district court did not explicitly base its ruling on this provision, and the Government does not rely on it on appeal. Even if the district court did rely on this language, it also contains the two key phrases at issue—"two or more firearms" and "another individual."

http://www.oed.com/view/Entry/8102 (last visited Apr. 7, 2016) (defining "another" as "[o]ne more, one further"). This alone strongly suggests that a sufficient number of firearms must be transferred to one person for the enhancement to apply. Moreover, when an adjective modifies a noun and, in the process, emphasizes its singularity, the plain meaning is more likely to incorporate the singular version of the noun. *See, e.g.*, *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010). "Another" accentuates the singularity of the term "individual" to a greater degree than if the provision would have applied to defendants that transferred "two or more firearms to *an* individual."

In addition, requiring at least two firearms to be transferred to a single person makes sense from a grammatical standpoint. In this instance, "to another individual" acts as a prepositional phrase that modifies the verb "transfer." ("[T]wo or more firearms" acts as the verb's direct object.) Thus, the relevant transferring must be done "to another individual," strongly suggesting that the transfer of one gun to two different people cannot be aggregated.

The structure of the Guidelines also tends to support this reading. Section 2K2.1(b)(1) provides for incremental increases to a defendant's offense level, "[i]f the offense involved three or more firearms." By its own terms, § 2K2.1(b)(1) covers any offense that *involved* at least three firearms, not just possession. Moreover, Application Note 5 to § 2K2.1 clarifies that subsection (b)(1) applies to "firearms that were . . . unlawfully distributed." While it may be true that a defendant would also have possessed the relevant firearms in the majority of these cases, this language critically undercuts the Government's position that subsection (b)(1) was intended solely to punish possession. Read in conjunction with subsection (b)(1), the trafficking enhancement appears to be aimed at defendants who provide multiple firearms to at least one buyer or other transferee—i.e., parties engaging in bulk transfers.

This conclusion is also supported by the rule of lenity. In this circuit, the rule of lenity applies when interpreting the Guidelines. *United States v. Nash*, 558 F. App'x 599, 605 (6th Cir. 2014) (citing *United States v. Galaviz*, 645 F.3d 347, 361–62 (6th Cir. 2011)). We have relied on the rule of lenity in interpretive questions that touch on application notes, *see Galaviz*, 645 F.3d at 362, and the justification for doing so is particularly strong when, as here, the commentary provides a substantive interpretation of the text of a Guidelines provision, as opposed to mere

illustration or factual examples.  Under the rule of lenity, "[e]ven if one could conclude that there were two rational readings of [a] Guideline[s provision], this Court would be bound to choose the less harsh reading."  *Id.* (first alteration in original) (quoting *United States v. Sanders*, 162 F.3d 396, 402 (6th Cir. 1998)).  Even assuming Henry's conduct fell within a *plausible* reading of these provisions, the fact that another reasonable reading exists that would subject him to less punishment is grounds for applying the less severe interpretation.  Accordingly, the district court erred in applying the § 2K2.1(b)(5) enhancement to Henry.

## II.        *Obstruction-of-Justice Enhancement*

### A.        Standard of Review

As with the firearm enhancements, we review de novo the district court's legal conclusions regarding § 3C1.1 enhancements for obstruction of justice, and we review the district court's factual findings for clear error.  *United States v. Collins*, 799 F.3d 554, 592–93 (6th Cir.), *cert. denied*, 136 S. Ct. 601 (2015).  Issues regarding the proper interpretation of a Guidelines provision present questions of law, which we review de novo.  *Id.* (citing *United States v. Murphy*, 241 F.3d 447, 458 (6th Cir. 2001)).  And "whether specific facts actually constitute an obstruction of justice" under § 3C1.1 constitutes a mixed question of fact and law, which we also review de novo.  *United States v. Bazazpour*, 690 F.3d 796, 805 (6th Cir. 2012).

### B.        Discussion

Section 3C1.1 provides for a two-level increase

> [i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

"[A]voiding or fleeing from arrest" does not ordinarily constitute obstruction.  USSG § 3C1.1 cmt. n.5(D).  But the obstruction-of-justice enhancement applies when a defendant "willfully fail[s] to appear, as ordered, for a judicial proceeding."  USSG § 3C1.1 cmt. n.4(E).

Henry argues that insufficient evidence existed for the district court to conclude that he acted willfully; indeed, he claims that "there is simply *no* evidence that . . . Henry 'willfully' took any action." The Guidelines do not define "willfully." While Henry notes that "'willfulness' is notoriously hard to define," sentencing courts have nevertheless managed to successfully make willfulness determinations for quite some time. "Willful" or "willfulness" has been described as "voluntary and intentional, but not necessarily malicious," *Black's Law Dictionary* (10th ed. 2014), and we have noted that, while "the term . . . has 'no fixed meaning,'" it "generally connotes some kind of deliberate or intentional conduct." *United States v. Brown*, 237 F.3d 625, 628 (6th Cir. 2001) (quoting *Smith v. Wade*, 461 U.S. 30, 63 n.3 (1983) (Rehnquist, J., dissenting)); *see also United States v. Wallace*, 600 F. App'x 322, 330 (6th Cir. 2015).

Henry was informed that he was required to attend the hearing, and he did not do so. The district court initially expressed reservations that Henry might have confused the date of the hearing, but Henry then repeatedly failed to contact the pretrial services office, failed to submit his monthly reports, and failed to attend a mandatory meeting with his pretrial services officer. These events suggest that Henry intentionally failed to attend the hearing. Moreover, the testimony from Henry's mother at sentencing did not undermine this conclusion. According to her account, she was unable to take him to the courthouse on one occasion. Nevertheless, he had an operable cell phone on that occasion and did not inform the court, his attorney, or the pretrial services officer of his inability to attend. In response to Henry's post-hearing conduct, the district court issued an arrest warrant that took over a year to execute—a year in which Henry presumably never contacted the pretrial services office. This is all circumstantial evidence, but circumstantial evidence can give rise to an inference of willfulness. *See United States v. Aldridge*, 455 F. App'x 589, 594 (6th Cir. 2012).

Nonetheless, the district court did not address a key piece of evidence weighing on Henry's willfulness. The PSR indicates that, on May 28, 2013, Henry was sentenced in Tennessee state court to fifteen days of confinement. Assuming that sentence began immediately, or at least before June 6, Henry would have been in custody on the date of the hearing he missed. If so, this would have an impact—a potentially dispositive impact—on the

willfulness analysis.  Although there was some confusion as to the exact offense that Henry was confined under, his counsel directed the district court to the correct page of the PSR during the sentencing hearing.  And, while Henry's mother's testimony provided some support for the district court's conclusion, her account was ambiguous as to whether the events she described occurred in June 2012 or 2013.

We need not reach the issue of whether this oversight constitutes clear error.  Because Henry's sentence will be vacated based on an erroneous application of the trafficking enhancement under § 2K2.1(b)(5), as discussed above, and we issue a general remand for resentencing, the district court can consider in the first instance the impact that this evidence has on Henry's willfulness in missing the hearing.  *See United States v. Moore*, 131 F.3d 595, 598 (6th Cir. 1997) (noting that when a circuit court issues a general remand, "the district court [may] resentence the defendant de novo" (citing *United States v. Young*, 66 F.3d 830, 836 (7th Cir. 1995); *United States v. Caterino*, 29 F.3d 1390, 1394–95 (9th Cir. 1994); *United States v. Cornelius*, 968 F.2d 703, 705–06 (8th Cir. 1992))).  Accordingly, we need not reach Henry's argument that, under Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure, the district court was required to, but did not, "resolve the factual question of [his] having been in state custody during some of the period during which he did not report."

## III.    *Halfway House Confinement*

### A.    Standard of Review

Because the district court gave Henry an opportunity to object to his sentence, as required by *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), and he did not challenge the terms of his supervised release,[7] we review the district court's decision to impose upon Henry an eighteen-month term in a halfway house only for plain error.  *See* Fed. R. Crim. P. 51(b); Fed. R. Crim. P. 52(b); *United States v. Zobel*, 696 F.3d 558, 572–73 (6th Cir. 2012) (noting that,

---

[7]Henry's counsel did not raise any objections related to the terms of supervised release, either in his sentencing memorandum or in the course of the sentencing proceedings.  Before imposing a sentence, the district court repeatedly mentioned that it was considering an eighteen-month term in a halfway house for Henry.  Henry's counsel did not lodge a specific objection.  Instead, he only reiterated his position that, based on his interpretation of the Guidelines applicable to Henry, he was "asking for a sentence of 31 to 41 months."  After the district court announced the sentence, it gave Henry the opportunity to object to its terms, but Henry's counsel only preserved the objections previously made.

without objection, the court reviews the procedural and substantive reasonableness of the length and condition of a term of supervised release only for plain error); *United States v. Vonner*, 516 F.3d 382, 385–386 (6th Cir. 2008) (en banc).  To succeed under plain-error review, Henry "must show (1) error (2) that was obvious or clear, (3) that affected [his] substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Solano-Rosales*, 781 F.3d 345, 351 (6th Cir. 2015) (quoting *United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010)).

B.      Procedural Reasonableness

"[P]rocedural reasonableness requires the district court to state 'its rationale for mandating special conditions of supervised release' in open court at the time of sentencing." *United States v. Widmer*, 785 F.3d 200, 203 (6th Cir.) (quoting *United States v. Kingsley*, 241 F.3d 828, 836 (6th Cir. 2001)), *cert. denied*, 136 S. Ct. 701 (2015).  When applying a condition of supervised release, a discussion of the § 3553(a) factors that satisfies the procedural reasonableness requirement for imposing a term of incarceration can show that attachment of special conditions was also procedurally reasonable. *Zobel*, 696 F.3d at 572 (citing *United States v. Presto*, 498 F.3d 415, 419 (6th Cir. 2007)).  Even if the district court failed to adequately explain its decision, the error is harmless if the reasons for imposing the special conditions are "clear from the record." *Collins*, 799 F.3d at 599 (quoting *United States v. Carter*, 463 F.3d 526, 529 n.2 (6th Cir. 2006)).

Though Henry claims that his term of confinement in a halfway house—alternatively described as "community confinement" by the Guidelines, *see* USSG § 5F1.1—was procedurally unreasonable, his opening brief provides little explanation of how the district court erred in this regard.  Even assuming that he did not waive the argument, however, his reply brief's reasoning does not meet his burden to show plain error.  Henry describes the district court's imposition of community confinement as "unexplained," then immediately concedes that the court discussed his addiction and the need for post-incarceration structure to prevent recidivism and relapse into addiction.  Henry argues, however, that the Guidelines account for addiction and still recommend a maximum of six months in a halfway house.

Henry substantially understates the extent of the district court's consideration of community confinement. As he noted, the court discussed his trouble with addiction and the fact that he needed to be in a structured environment after being released from prison to prevent returning to drug use. But the court did more than this. It also identified Henry's addiction as "serious," or particularly bad, due to the court's belief that "he was selling . . . weapons to finance his addiction." More generally, the court considered the § 3553(a) factors, finding that Henry was a first-time felony offender but that "an AK-47 being sold is a serious matter[ and] can do great harm," that the sentence fashioned could achieve the goal of deterrence, and that Henry could get needed drug treatment through the sentence. The court also discussed in depth its options in sentencing and considered the Guidelines' recommended range. Given this context, the district court did not plainly err.

C.     Substantive Reasonableness

A special condition of supervised release is substantively reasonable if it

(1) is reasonably related to specified sentencing factors, namely the nature and circumstances of the offense and the history and characteristics of the defendant, and the need to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(2) involves no greater deprivation of liberty than is reasonably necessary to achieve these goals; and

(3) is consistent with any pertinent policy statements issued by the Sentencing Commission.

*Zobel*, 696 F.3d at 573 (quoting *United States v. Ritter*, 118 F.3d 502, 504 (6th Cir. 1997)).

Henry's arguments focus on the second and third of these prongs, but we will briefly address the first. As discussed above, the district court considered the relevant sentencing factors, and its decision to sentence Henry to eighteen months of community confinement was reasonably related to these factors. The court balanced the seriousness of Henry's offense, including the fact that it was his first felony offense, with the extent of his addiction, which was also serious. Thus, the district court satisfied this prong, especially under plain error review.

As to the second prong, Henry intimates that the term of halfway house confinement involves a greater deprivation of liberty than necessary because the court already ordered other drug rehabilitation and did not explain how halfway house confinement would be more effective than home confinement or regular supervised release with drug testing. This argument lacks merit. The district court was not singularly concerned with breaking Henry's addiction in the first instance; it also considered Henry's potential for relapse and the need for a transitional period post-incarceration. Thus, community confinement was an integral part of the court's rehabilitation plan, not a superfluous addition. Also, Henry's claim that drug testing alone would be sufficient to address his addiction issues seems particularly implausible when one considers that his regime of pretrial drug testing was ineffective. And, on this point, Henry may not even be complaining of a "greater deprivation of liberty" than the alternative because home confinement is not necessarily less restrictive than community confinement. *See United States v. Minor*, 440 F. App'x 479, 486 (6th Cir. 2011) ("Home detention can be more restrictive than time spent in a halfway house." (citing *United States v. Jones*, 107 F.3d 1147, 1169 n.7 (6th Cir. 1997) (Krupansky, J., concurring in part and dissenting in part); *Piro v. Duncan*, No. 08-491-TUC-CKJ, 2009 WL 259568, at *2 (D. Ariz. Feb. 4, 2009); *United States v. White*, 785 F. Supp. 1062, 1063–64 (D. Mass. 1992))). Moreover, we have found that even a two-year term of community confinement was likely no greater than necessary where, as here, the alternative option would likely have been a longer term of incarceration. *See United States v. Gilpatrick*, 548 F.3d 479, 484 n.4 (6th Cir. 2008). Therefore, Henry has not shown plain error under this prong.

Considering the final prong, Application Note 2 to § 5F1.1 provides that "[c]ommunity confinement generally should not be imposed for a period in excess of six months. A longer period may be imposed to accomplish the objectives of a specific rehabilitative program, such as drug rehabilitation."**[8]** Henry argues that his sentence was contrary to this statement because the district court ordered drug rehabilitation while he was in prison, and "there was no order for

---

**[8]**The Government argues that this provision does not constitute a "policy statement" under the Guidelines because it is contained in an application note. The Guidelines make clear, however, that an application note is "the legal equivalent of a policy statement." USSG § 1B1.7; *see also Melendez v. United States*, 518 U.S. 120, 131 (1996) (Souter, J., concurring).

specific drug treatment while at a halfway house nor any explanation of why a halfway house would be any better for drug rehabilitation than ordinary supervised release."

This fails to show plain error.  To be substantively reasonable, a special condition need not have "affirmative support" in a policy statement; all that is required is "that the condition not *conflict* with [any] pertinent policy statements."  *United States v. Taylor*, 461 F. App'x 459, 460 (6th Cir. 2012) (citing *Kingsley*, 241 F.3d at 837–38 & n.14).  Here, Henry admits that the district court had discretion to impose a period of community confinement longer than six months.  This alone may be enough to fatally undermine Henry's claim, as the Guidelines do not specify that a rehabilitation program is the *sole* reason a district court could impose a term in a halfway house greater than six months.  *See* USSG § 5F1.1 cmt. n.2.  Where the Guidelines grant discretion, the fact that the district court imposed a special condition under circumstances different than those expressly authorized "does not make the imposition of the special condition inconsistent with the policy statement."  *Carter*, 463 F.3d at 530 n.5.  More importantly, the district court's decision regarding community confinement *was* related to drug rehabilitation; it was aimed at preventing Henry's relapse into addiction after leaving prison.  And, as discussed above, the district court did not act unreasonably in declining to impose ordinary supervised release because of Henry's conduct during pretrial supervision.  Thus, Henry has not demonstrated plain error.

Regardless of this conclusion, the district court's decision to impose eighteen months of community confinement was a part of a holistic, interconnected analysis of the various applicable Guidelines provisions and the available sentencing options.  As such, the district court's community confinement determination was a single component of "a package of sanctions that [it] utilize[d] to effectuate its sentencing intent."  *Pepper v. United States*, 562 U.S. 476, 507 (2011) (quoting *United States v. Stinson*, 97 F.3d 466, 469 (11th Cir. 1996) (per curiam)).  Accordingly, as discussed above, we issue a general remand to allow the district court to reconsider the terms of supervised release in light of the new Guidelines calculations and sentencing options.

**CONCLUSION**

For the reasons stated above, we **VACATE** Henry's sentence and **REMAND** the case to the district court for resentencing consistent with this opinion.