NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0290n.06

| | | |
|---|---|---|
| UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT | | **FILED**<br>May 26, 2020<br>DEBORAH S. HUNT, Clerk |

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | NORTHERN DISTRICT OF |
| JUAN BENITO CARO-SILVA, APOLINAR | ) | OHIO |
| MERAZ-MAGANA, | ) | |
| | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

---

BEFORE:    COLE, Chief Judge; BATCHELDER and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.**    Juan Benito Caro-Silva and Apolinar Meraz-Magana appeal the sentences imposed for their convictions in connection with a drug conspiracy. We AFFIRM.

## I.    BACKGROUND

In May 2017, Caro-Silva met Karla Hernandez-Salazar and began supplying cocaine to her for resale in Canton, Ohio. Caro-Silva asked Hernandez-Salazar if she would also sell methamphetamine, but she declined, stating that she sold only cocaine. The two began a romantic relationship, and Caro-Silva decided to move from California to Ohio so that they could sell drugs together. He brought four pounds of methamphetamine, which Hernandez-Salazar refused to sell because she believed harsher penalties attached to the sale of meth. Hernandez-Salazar nevertheless allowed Caro-Silva access to her cocaine clients to see if they were interested in

purchasing methamphetamine and facilitated communications when they required English, which Caro-Silva did not speak.

Caro-Silva sold methamphetamine to various individuals, including Ignacio Gutierrez and Jonathan Quezada, two of Hernandez-Salazar's customers. He then began contacting Hernandez-Salazar's other cocaine supplier for more methamphetamine to sell, and after obtaining more supplies, sold methamphetamine to more of Hernandez-Salazar's customers. One day, after Caro-Silva sold four pounds of methamphetamine, he and Hernandez-Salazar encountered Hernandez-Salazar's ex-boyfriend Manuel Ibarra driving his truck. Caro-Silva followed Ibarra's truck through a drive-thru, confronted him, and shot him, all of which Hernandez-Salazar testified was due to jealousy of Ibarra.

Caro-Silva and Hernandez-Salazar then returned home so that Caro-Silva could collect their drugs, guns, and money for fear that law enforcement would find the contraband when investigating the shooting. While Hernandez-Salazar served as a lookout, Caro-Silva placed the drugs, guns, and money in a duffel bag, and they both drove to meet Quezada, who agreed to hide the bag for them. FBI Special Agent Heather Blohm testified that she had placed a GPS tracking unit on Hernandez-Salazar's car, which showed a trip to Quezada's neighborhood that night. Law enforcement subsequently executed two searches: one at Hernandez-Salazar's home, finding five kilograms of cocaine and a large sum of money; the second at Quezada's residence, finding a duffel bag containing seven and a half pounds of methamphetamine, as well as cocaine, marijuana, and cash.

Blohm and other FBI agents had been investigating Hernandez-Salazar for cocaine trafficking since 2016, conducting multiple controlled buys through a confidential source. The agents also wiretapped Hernandez-Salazar's cell phone and placed a pole camera outside her

house. When asked by the confidential source if she would sell methamphetamine, Hernandez-Salazar declined stating she was not in that business. Caro-Silva then moved in with Hernandez-Salazar, and investigators believed that they were selling drugs together.

Separately, FBI Special Agent Timothy Alvord began investigating Meraz-Magana for cocaine trafficking by intercepting his cell phone calls and surveilling drug transactions discussed during those calls. Alvord witnessed Meraz-Magana visit a storage facility on several occasions; specifically, he saw Meraz-Magana enter storage Unit A22. And after interviewing the owner of the facility, Alvord learned that the unit was rented to Rosa Zambrano, an acquaintance of Meraz-Magana.

During the summer of 2017, agents intercepted a phone call during which Meraz-Magana said he would take the caller to a storage facility where he had a unit to see if the facility would rent another unit to him. Alvord visited the storage facility the next day and learned that Meraz-Magana had just rented Unit D16-27. Agents then placed cameras outside both A22 and D16-27 and, between August 25 and October 22, 2017, saw Meraz-Magana access the units on at least eight separate occasions; no one else accessed the units.

With the storage facility's owner's consent, Alvord entered Unit D16-27 and discovered a loaded gun, nineteen individually wrapped, vacuum-sealed bags containing marijuana, and nine mostly empty bags of suspected cocaine, one of which was labelled "1000G" and two of which contained visible white powder. The bags containing white powder tested positive for cocaine. Alvord found three additional bags, two that were labelled "2.5lb" and one marked "2.5," which contained residue and a crystal. The residue and crystal tested positive for methamphetamine, and the crystal was determined to be 100 percent pure, plus or minus four percent.

After securing a warrant, agents also searched Unit A22 and discovered five firearms and 800.93 grams of a brown-like substance that tested positive for traces of heroin. They also found paperwork in Meraz-Magana's name and mail addressed to him. The following day, agents searched Meraz-Magana's residence and discovered the rental agreement for Unit D16-27.

Caro-Silva and Meraz-Magana were both indicted. Caro-Silva pled guilty to conspiracy to possess with the intent to distribute and to distribute cocaine, 21 U.S.C. §§ 841(a)(1) and (b), in violation of 21 U.S.C. § 846; using a communications facility for distribution of cocaine, in violation of 21 U.S.C. § 843; possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(I)(II); and being an alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). Meraz-Maga pled guilty to conspiracy with intent to distribute cocaine, in violation of 21 U.S.C. § 846; and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(A)(ii).

Caro-Silva's guidelines range was 188 to 235 months; the district court sentenced him to 188 months. Meraz-Magana's guideline range was 210 to 262 months for one count and a consecutive five years to life imprisonment for the second count; the district court sentenced him to 210 months for the first count and a consecutive 60 months for the second.

These appeals followed.

## II. ANALYSIS

### A. Caro-Silva

Caro-Silva appeals his sentence. We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Henry*, 819 F.3d 856, 864 (6th Cir. 2016).

Caro-Silva argues that the district court violated his due process rights when it attributed to him, as relevant conduct, methamphetamine discovered in the duffel bag located at Quezada's

residence.  *See generally* USSG § 1B1.3(a).  "[D]ue process requires that *some* evidentiary basis beyond mere allegation in an indictment be presented to support consideration of such conduct as relevant to sentencing."  *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992).  That evidentiary basis must have "some minimal indicium of reliability," *United States v. Santana*, 723 F. App'x 331, 337 (6th Cir. 2008), which is "a relatively low hurdle," *United States v. Greene*, 71 F.3d 232, 235 (6th Cir. 1995).

Caro-Silva argues that Hernandez-Salazar's testimony regarding the duffel bag was self-serving and uncorroborated.  But Special Agent Blohm's testimony demonstrates otherwise.  First, detailing various investigations, Blohm stated that she had never observed Hernandez-Salazar selling methamphetamine.  Second, Blohm had placed a GPS unit on Hernandez-Salazar's vehicle which tracked it from Hernandez-Salazar's apartment to Quezada's neighborhood on the night Hernandez-Salazar testified she and Caro-Silva had given the duffel bag containing methamphetamine to Quezada.  Hernandez-Salazar's testimony thus bears "some minimal indicium of reliability" to support the district court's decision to attribute to Caro-Silva the methamphetamine discovered in the duffel bag.  That determination does not rise to clear error.

Caro-Silva nevertheless argues that Hernandez-Salazar's testimony is unreliable because when arrested, she lied to the FBI about her involvement with the conspiracy.  But Hernandez-Salazar testified that she did not initially disclose her full involvement in the drug conspiracy because at that point she did not have an attorney, was pregnant, and feared incarceration.  When she did secure counsel, Hernandez-Salazar cooperated and offered admissions of guilt.  Blohm also corroborated various aspects of Hernandez-Salazar's testimony, as explained above.  This record does not leave us "with the definite and firm conviction" that the district court committed a mistake.  *United States v. Darwitch*, 337 F.3d 645, 663 (6th Cir. 2003) (quoting *United States v.*

*Latouf*, 132 F.3d 320, 331 (6th Cir. 1997)); *see also United States v. Moncivais*, 492 F.3d 652, 659

(6th Cir. 2007) ("[C]o-conspirators' hearsay statements are admissible at sentencing,

notwithstanding the fact that such statements may be 'suspect' on account of co-conspirators'

'explicit or implicit desire to secure favorable treatment from the police.'" (quoting *United States

v. Hunt*, 487 F.3d 347, 352–53 (6th Cir. 2007))).

Lastly, Caro-Silva contends that the Government's decision to indict him for cocaine, but

not methamphetamine, undermines Hernandez-Salazar's testimony. But "[r]elevant conduct need

not be charged." *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). The Government,

moreover, explained that the indictment was filed before the lab could test the methamphetamine's

purity, and it intended to file a superseding indictment depending on those test results. The

Government's decision to proceed before receiving the test results has no bearing on the reliability

of Hernandez-Salazar's testimony or the district court's sentencing conclusions.

### B. Meraz-Magana

Meraz-Magana challenges his sentence, arguing that the district court erred in attributing

to him the drugs found in the two separate storage units: A22 and D16-27. *See generally* USSG

§ 1B1.3(a). We apply the standard of review explained above.

Section 1B1.3 provides, in relevant part, that a Guidelines determination shall be based on

"all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or

willfully caused by the defendant." USSG § 1B1.3(a)(1)(A). The district court relied on

Application Note 3D, which states that "the defendant is accountable . . . for all quantities of

contraband with which he was directly involved . . .." USSG § 1B1.3(a)(1)(A) cmt. n.3D. Meraz-

Magana contends that the court's reliance on this Application Note was in error, citing *United

States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (en banc). In *Havis*, we held that "[t]he Guidelines'

definition of 'controlled substance offense' does not include attempt crimes," and thus the Sentencing Commission exceeded its authority by issuing commentary that listed attempts as "controlled substance offenses" under USSG § 4B1.2(b). *Id.* at 385–86. Application Note 3D does not similarly add to or expand upon the text of § 1B1.3(a)(1)(A)—it simply interprets "all acts and omissions committed" to include drugs. *See Stinson v. United States*, 508 U.S. 36, 42–43 (1993) (holding that "[c]ommentary which functions to interpret a guideline or explain how it is to be applied . . . controls, and if failure to follow, or a misreading of, such commentary results in a sentence selected from the wrong guideline range . . ., that sentence would constitute an incorrect application of the sentencing guidelines" (quoting *Williams v. United States*, 503 U.S. 193, 203 (1992)). The district court did not err in applying Application Note 3D.

We turn to the facts. Agents discovered mail inside unit A22 addressed only to Meraz-Magana. The owner of the facility identified Meraz-Magana as the renter of unit D16-27, and agents found a copy of the rental agreement for that unit in Meraz-Magana's room at his residence. Unit D16-27 was also rented the day after Meraz-Magana informed someone, in an intercepted communication, that he planned to rent another storage unit at the same facility where he already had a unit, the facility where unit A22 was located. Agent Alvord personally observed, and surveillance footage captured, Meraz-Magana visiting and accessing both A22 and D16-27 on numerous occasions. The record provides ample grounds to establish that Meraz-Magana was "directly involved" with the drugs found inside the units. The district court did not clearly err in attributing the drugs to Meraz-Magana as relevant conduct under U.S.S.G. § 1B1.3(a).

Meraz-Magana also challenges the district court's determination that 72,270 kilograms of converted drug weight was attributable to him. For drug determinations, the district court must rule on disputed calculations and explain its factual foundation for doing so. *See* Fed. R. Crim. P.

32(i)(3)(B); *United States v. Poulsen*, 655 F.3d 492, 512–13 (6th Cir. 2011). Quantity determinations are a finding of fact and are reviewed for clear error. *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013). "An estimate will suffice as long as it is supported by a preponderance of the evidence." *Id.*

The Government presented, and the district court relied on, the following: In unit D16-27, agents discovered nine same-sized, mostly empty bags, one of which was labeled "1000g," and two of which contained visible white powder. The bags containing white powder or residue tested positive for cocaine. Agents found three additional bags, two of which were marked "2.5lb" and one labelled "2.5," containing residue that tested positive for methamphetamine and a crystal that effectively tested as 100 percent pure methamphetamine. Based on the presence and testing of the residue, the bags' labels, and the inference that the bags were once full, the district court attributed approximately 72,270 kilograms of drugs to Meraz-Magana. The district court identified the particular evidence it relied on in making its calculation, *see United States v. Henley*, 360 F.3d 509, 515–16 (6th Cir. 2004), and the record supports its ultimate determination. The court did not clearly err.

Lastly, Meraz-Magana challenges the district court's application of a four-level enhancement for Meraz-Magana's leadership role in the drug conspiracy. *See generally* USSG § 3B1.1(a). We review the court's factual finding for clear error and review de novo the legal conclusion that Meraz-Magana was an organizer or leader. *See United States v. Sexton*, 894 F.3d 787, 794 (6th Cir. 2018).

"In general, 'a defendant must have exerted control over at least one individual within a criminal organization for the enhancement of § 3B1.1 to be warranted.'" *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (quoting *United States v. Gort-Didonato*, 109 F.3d

318, 321 (6th Cir. 1997)). We consider other factors, including a defendant's decision-making authority, the nature of his participation in the commission of the offense, whether he recruited accomplices, the degree of his participation in planning or organizing the offense, and the degree of his control and authority exercised over others. USSG § 3B1.1 cmt. n.4.

The record demonstrates that Meraz-Magana decided to whom drugs should be sold and the method of payment, collected money, sold drugs himself, and obtained drugs for others to sell. For example, Meraz-Magana instructed a co-conspirator, Ignacio Gutierrez, over the phone where the drugs were located, to whom he was to sell, and when and where he was to meet the drug purchaser. The purchaser then would deliver the payment to Meraz-Magana himself. In another instance, Gutierrez told Meraz-Magana that his customer was anxious to receive his cocaine; Meraz-Magana responded that the customer would have to wait until he was ready. Meraz-Magana's conduct demonstrates that he exercised decision-making authority and played a leadership role in the conspiracy.

Meraz-Magana argues that Gutierrez was the leader, but a conspiracy can have multiple leaders or organizers. *See* USSG § 3B1.1 cmt. n.4; *see also United States v. Sadler*, 750 F.3d 585, 594 (6th Cir. 2014). That Gutierrez occasionally assumed a leadership position does not diminish the leadership role Meraz-Magana played. Ample grounds supported the enhancement.

## III.  CONCLUSION

We **AFFIRM** the sentencing decisions of the district court.