NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0004n.06

Nos. 16-5429/5430/5496

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jan 03, 2018 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| RICHARD THORNTON; KEENEN CRANE; | ) | COURT FOR THE EASTERN |
| DAVID TATUM, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:   BATCHELDER, GRIFFIN, and WHITE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge**.   Appellants Richard Thornton, Keenen Crane, and David Tatum were members of a large bank-fraud conspiracy.  The conspiracy took place between March 2014 and February 2015, reached across thirteen states, and included approximately 1,400 counterfeit checks and almost $3 million in intended loss.  The conspirators stole checks from businesses' mailboxes, targeting industrial or business parks, used the stolen checks to create fake business checks—made out to homeless individuals whom they had recruited to cash the fake checks—and fleeced local banks for a day or two before moving on to another town.  The conspirators were eventually caught and pleaded guilty.  Thornton, Crane, and Tatum appeal several sentencing issues.  For the reasons that follow, we affirm.

**I.**

Thornton, Crane, and Tatum were indicted in March 2015 in the United States District Court for the Eastern District of Kentucky.  Thornton and Tatum were both charged with

(1) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; (2) bank fraud, in violation of 18 U.S.C. § 1344; and (3) aggravated identity theft, in violation of 18 U.S.C. § 1028A. Crane was charged only with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. Each of three pleaded guilty to conspiracy to commit bank fraud and raised several objections at sentencing. Thornton, Crane, and Tatum were sentenced to within-Guidelines sentences of 136 months, 80 months, and 66 months of imprisonment, respectively. Each timely appealed his sentence.

The present consolidated appeals raise four issues regarding the procedural and substantive reasonableness of their sentences. First, each of the appellants argues that the district court erred in calculating his advisory Guidelines range by applying a two-level enhancement for using a "means of identification" in the offense. Second, Crane and Tatum argue that the district court erred by applying a two-level enhancement for relocation of the scheme to evade law enforcement. Third, Crane argues that the district court clearly erred in calculating the intended loss amount attributed to him. Finally, Crane argues that the district court abused its discretion by failing to grant his request for a downward variance.

## II.

"Sentencing challenges are reviewed for abuse of discretion." *United States v. Coppenger*, 775 F.3d 799, 802 (6th Cir. 2015) (citations omitted). We review a sentence for procedural reasonableness, including "whether the district court properly calculated a defendant's Guidelines range." *United States v. Jackson*, ___ F.3d ___, No. 16-2415, 2017 WL 6015425, at *2 (6th Cir. Dec. 5, 2017) (quoting *United States v. Seymour*, 739 F.3d 923, 929 (6th Cir. 2014)). We also review a sentence for substantive reasonableness, including whether a district court "imposed a sentence arbitrarily, based on impermissible factors, or unreasonably

weighed a pertinent factor." *Coppenger*, 775 F.3d at 803 (citing *United States v. Adkins*, 729 F.3d 559, 563 (6th Cir. 2013)).

A district court's interpretation of the Guidelines is a legal question that we review de novo. *United States v. Duke*, 870 F.3d 397, 401 (6th Cir. 2017). "But with respect to a district court's *application* of the Guidelines, 'we review the district court's factual findings for clear error and mixed questions of law and fact *de novo*.'" *Id.* (quoting *United States v. Tolbert*, 668 F.3d 798, 800 (6th Cir. 2012)). "A finding is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Tolbert*, 668 F.3d at 800).

## A. Means-of-Identification Enhancement

Thornton, Crane, and Tatum argue that the district court erred in calculating their advisory Guidelines ranges by applying a two-level enhancement for using a "means of identification" in the offense.

The means-of-identification enhancement states: "If the offense involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification . . . increase by 2 levels." USSG § 2B1.1(b)(11)(C)(i). The term "'[p]roduce' includes manufacture, design, alter, authenticate, duplicate, or assemble." USSG § 2B1.1, comment. (n.10(A)). And "'[m]eans of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e., not fictitious) individual . . . ." USSG § 2B1.1, comment. (n.1). Section 1028(d)(7) defines "means of identification" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any—(A) name, social security number, date of birth . . . (C) unique electronic identification number, address, or routing

code . . . ." *See United States v. Johnson*, 658 F. App'x 244, 245–46 (6th Cir. 2016). This particular enhancement "is appropriate where a person uses one means of identification to generate another." *United States v. Gonzalez*, 644 F. App'x 456, 464 (6th Cir. 2016) (citing USSG § 2B1.1, comment. (backg'd)).

The district court properly applied the means-of-identification enhancement. The district court found (and Thornton and Crane admit) that, although the aim of the conspiracy was to steal, forge, and cash business checks, on one occasion a personal check was stolen and counterfeited during the course of the conspiracy.[1] From that personal check, the conspirators created seven counterfeit checks payable to three different individuals. That is, during the course of the conspiracy the conspirators stole at least two unique means of identification from that personal check: an actual person's name and that individual's bank account and routing number. They used those means of identification to produce—manufacture, alter, duplicate, or assemble— counterfeit personal checks. The counterfeit personal checks included at least two means of identification from the original personal check: an actual person's name and that individual's bank account and routing number. The conspirators' theft and counterfeiting of a personal check is sufficient to support application of the means-of-identification enhancement. *See United States v. Norwood*, 774 F.3d 476, 482 (8th Cir. 2014) ("We read the Guidelines's definition of 'produce' to include duplicating a means of identification such as a bank account number and transferring it onto a new medium, such as a counterfeit check.").

---

[1] Tatum argues that the theft and counterfeiting of a personal check should not have been attributed to him as relevant offense conduct because he could not reasonably foresee that activity. This argument was not presented to the district court. The argument, therefore, is waived and we apply plain-error review. *Jackson*, ___ F.3d at ___, 2017 WL 6015425, at *3. As Tatum did not present any evidence to counter the government's proof of his knowledge of and agreement to the bank-fraud conspiracy, we cannot find that the district court plainly erred by finding Tatum responsible for the theft and counterfeiting of a personal check that occurred in connection with that conspiracy.

Thornton, Crane, and Tatum present two reasons why the enhancement should not apply. Neither has any merit. First, they argue that the district court interpreted the term "involve," as used in USSG § 2B1.1(b)(11)(C), too broadly. They assert that the plain meaning of the term "involve" requires more than a limited use of an actual person's identification. "In construing the Guidelines, we employ the traditional tools of statutory interpretation, beginning with the text's plain meaning." *United States v. Babcock*, 753 F.3d 587, 591 (6th Cir. 2014) (citation omitted). As the district court found, the plain meaning of the term "involve" does not include a substantiality requirement. The term "involve" means "[t]o contain as a part; include," American Heritage Dictionary of the English Language 921 (4th ed. 2000), or "to have within or as a part of itself," Merriam-Webster's Collegiate Dictionary 617 (10th ed. 1994).[2] *See also United States v. Scheels*, 846 F.3d 1341, 1342 (11th Cir. 2017); *United States v. Montgomery*, 468 F.3d 715, 719–20 (10th Cir. 2006). The plain meaning of the term includes even slight inclusion. *See Plane v. United States*, 750 F. Supp. 1358, 1373 n.4 (W.D. Mich. 1990). Even though the personal check was not a large part of the overall conspiracy offense, it was still involved—contained or included—in the offense to which Thornton, Crane, and Tatum pled guilty.

Second, they argue that the enhancement was not intended to apply to their conduct here. Instead, they argue, the means-of-identification enhancement was designed to punish "breeding" offenses: using means of identification to obtain *new* means of identification, such as opening a new account or a new line of credit. *See United States v. Williams*, 355 F.3d 893, 898–900 (6th

---

[2] We focus on these particular dictionary editions because the means-of-identification enhancement was added to the Guidelines (originally at § 2F1.1(b)) in Guidelines Amendment 596 in November 2000, see USSG Supp. to App. C (2001), and it has remained largely unchanged since that time. In determining the plain meaning of a term, "we give 'terms the ordinary meaning that they carried' when the provision was put into effect." *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016) (quoting *Norfolk S. Ry. Co. v. Perez,* 778 F.3d 507, 512 (6th Cir. 2015)). We note that the meaning of the term "involve" has not changed significantly since that time.

Cir. 2003) (discussing breeding offenses). But, "[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016) (quoting *United States v. Jackson*, 635 F.3d 205, 209 (6th Cir. 2011)). The intent of the Sentencing Commission and Congress does not overcome the plain language of the Guidelines. We are further persuaded by the several other circuits that have upheld application of the means-of-identification enhancement in similar circumstances, where the original means of identification was duplicated onto another medium rather than used to obtain a different or new of means of identification. *See United States v. Sash*, 396 F.3d 515, 524 (2d Cir. 2005) (noting that even if the court were to "resort to the background commentary" of the means-of-identification enhancement, "nothing in the commentary *requires* that identity theft or 'breeding' be found in order to apply the [e]nhancement"); *accord Norwood*, 774 F.3d at 482; *United States v. Newsome*, 439 F.3d 181, 185 (3d Cir. 2006); *United States v. Melendrez*, 389 F.3d 829, 833–34 (9th Cir. 2004). We hold that the district court properly applied the means-of-identification enhancement in calculating Thornton's, Crane's, and Tatum's advisory Guidelines ranges.[3]

### B. Relocation Enhancement

Crane and Tatum assert that the district court erred in calculating their advisory Guidelines ranges by applying a two-level enhancement for relocating the scheme to evade law enforcement. We find no error.

The relocation enhancement is found at USSG § 2B1.1(b)(10)(A): "If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law

---

[3] The district court also found that the conspirators stole and duplicated an authorized payor's signature on many of the counterfeit business checks and that such conduct was also grounds to apply the means-of-identification enhancement. The Eighth Circuit has recently held the same. *See United States v. Weaver*, 866 F.3d 882, 884 (8th Cir. 2017) (citing cases in support). We need not address this matter, however, because the conspirators' theft and counterfeiting of a personal check is sufficient ground on which to affirm the application of the enhancement.

enforcement or regulatory officials . . . increase by 2 levels." This enhancement "punish[es] multi-jurisdictional criminal enterprises and criminal methods that prevent detection by law enforcement." *United States v. Lyles*, 506 F. App'x 440, 447 (6th Cir. 2012). This court and others have found that the relocation enhancement applies where travel to other jurisdictions was a key component of a fraud scheme. *See United States v. Savarese*, 686 F.3d 1, 15–16 (1st Cir. 2012) (affirming relocation enhancement because the theft and fraudulent use of credit cards in a variety of locations "comprised the heart of the enterprise"); *United States v. Hessa*, 464 F. App'x 473, 475 (6th Cir. 2012) (affirming relocation enhancement because the "logical explanation" for defendant's travel to numerous states to make fraudulent returns was "to avoid detection"); *accord United States v. Johnson*, 486 F. App'x 412, 414 (5th Cir. 2012). Relocation need not "be motivated by a 'specific' threat of arrest as opposed to a more general intent to evade law enforcement." *United States v. Vega-Iturrino*, 565 F.3d 430, 433 (8th Cir. 2009); *accord United States v. Braxton*, 374 F. App'x 248, 249–50 (3d Cir. 2010).

The district court properly applied the relocation enhancement. The district court determined that "relocation was key to the scheme." "The very essence of this conspiracy was getting as much money as possible through cashing counterfeit checks and then leaving that jurisdiction before law enforcement was able to detect the activity." Even though the conspirators presented some evidence that many of them lived in the Atlanta area, the district court rejected the argument that Atlanta was the hub of operations because "[t]here's really no evidence that the parties met, planned, divvied up the money, [or] made decisions about where [they were] going to go next" from Atlanta. The district court found that the conspirators effectively carried their conspiracy with them to each new town, relocating the scheme each time they changed location. *See Hessa*, 464 F. App'x at 475.

Crane and Tatum argue that the district court should have interpreted the term "relocate" to mean the moving of something with a fixed location, citing *United States v. Hines-Flagg*, 789 F.3d 751, 755 (7th Cir. 2015), and *United States v. Morris*, 153 F. App'x 556, 557–58 (11th Cir. 2005). Crane and Tatum's argument is incorrect for two reasons. First, the plain meaning of the term "relocate" does not require permanency or intent to remain in the new location. The term "relocate" means "[t]o move or be moved to a new place," American Heritage Dictionary of the English Language 1525 (3d ed. 1992), or "to locate again"; "establish or lay out in a new place"; "to move to a new location," Merriam-Webster's Collegiate Dictionary 988 (10th ed. 1994).[4] *See Morris*, 153 F. App'x at 558. Second, *Hines-Flagg* and *Morris* are inapposite because the schemes in those cases operated in multiple jurisdictions with a specific location as a home base. In *Hines-Flagg*, the defendant would research victims and make fake identifications using her home computer in Detroit. *Hines-Flagg*, 789 F.3d at 753. And, even though she would leave Detroit twice a year to open store credit cards and use the fraudulent identifications, she would return to Detroit to fence the merchandise she bought. *Id.* at 753–74. As the Seventh Circuit explained, "the scheme was not '*re*located' to Wisconsin, Ohio, and Illinois when Hines–Flagg traveled to those locations for temporary trips and returned to Detroit." *Id*. at 755. Similarly, the *Morris* defendants left town on a temporary basis and returned to their home base in the Northern District of Georgia. *Morris*, 153 F. App'x at 558. The conspiracy at issue here did not include a home base of operations. Instead, as the district court found, the scheme moved with the conspirators from town to town.

---

[4] We focus on these particular dictionary editions because the relocation enhancement was added to the Guidelines (originally at § 2F1.1(b)) in Guidelines Amendment 577 in November 1998, see USSG Supp. to App. C (2001), and has remained largely unchanged since that time. *See supra* note 2. The meaning of the term "relocate" also has not changed significantly since that time.

Crane and Tatum also argue that the district court clearly erred by finding that they relocated for the purpose of evading law enforcement, because, they assert, the entire scheme was dedicated to changing locations. This court has previously rejected similar "method of operation" arguments. *See Hessa*, 464 F. App'x at 475 (rejecting the argument that the defendant did not have a purpose of evading law enforcement and was instead defrauding different stores as a "method of operation"); *accord Lyles*, 506 F. App'x at 448. In this case, the government presented evidence that the relevant bank fraud was completed in each new location: the conspirators would steal checks, recruit check cashers, make the counterfeit checks—using the computer and printer that they carried with them specifically for that purpose—and cash the counterfeit checks before leaving town. The conspirators presented minimal evidence disputing the government's proof, and the district court properly found that the conspirators' relocation was done with a purpose of avoiding detection. "Obviously, staying in one location too long would result in banks and branches of banks providing notification to law enforcement," and "it would be very difficult to continue the scheme." Based on this information, the district court did not clearly err by finding that the scheme was relocated to evade law enforcement, and the court properly applied the relocation enhancement.

### C. Loss Amount

Crane argues that the district court clearly erred in calculating the loss amount attributed to him. It did not.

"We review the district court's calculation of the 'amount of loss' for clear error, but consider the methodology behind it de novo."[5] *United States v. Washington*, 715 F.3d 975, 984

---

[5] Crane argues that this objection is subject to de novo review because he claims to dispute the district court's calculation methodology. However, it is not the district court's *methodology* that Crane disputes, but rather the factual conclusions that the district court used to support its methodology. We therefore apply clear-error review.

(6th Cir. 2013) (citing *United States v. Poulsen*, 655 F.3d 492, 512–13 (6th Cir. 2011)). The loss amount "is the greater of actual loss or intended loss." USSG § 2B1.1, comment. (n.3(A)). Here, the parties do not dispute that the intended loss amount is greater. "'Intended loss' (I) means the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1, comment. (n.3(A)(ii)). "The court need only make a reasonable estimate of the loss," and the court's loss determination is entitled to deference. *Id.* § 2B1.1, comment. (n.3(C)). "[A] court 'does not have to establish the value of the loss with precision; it simply needs to publish the resolution of contested factual matters that formed the basis of the calculation.'" *United States v. Patel*, ___ F. App'x ___, No. 15-2001, 2017 WL 4461040, at *2 (6th Cir. Oct. 6, 2017) (quoting *Poulsen*, 655 F.3d at 513). To find whether the district court erred in calculating the loss amount, we must "determine '(1) whether the amount was in dispute; (2) if it was in dispute, whether the district court adequately ruled on the disputed amount; and (3) if the district court ruled, whether the factual findings indicate clear error.'" *Id.* (quoting *Poulsen*, 655 F.3d at 513).

Crane disputed the intended loss amount, which was determined by the district court during a two-day evidentiary hearing in which the government presented evidence that the conspirators used a computer and VersaCheck program—a software program for writing and printing checks—to write and print the counterfeit checks. Forensic review of that computer revealed saved images of stolen checks and authorized signatures and the VersaCheck program, which contained a detailed ledger of the counterfeit checks that the conspirators had printed and a database of account information for various financial institutions, businesses, and payees. The VersaCheck ledger revealed that approximately 1,416 checks had been printed between March 4, 2014, and February 10, 2015, totaling approximately $2,980,022.68 and including over 100

victims. The government calculated the conspiracy's intended loss amount by corroborating the raw data from the VersaCheck ledger with conspirator testimony and documentation from the financial institutions and businesses targeted by the conspiracy. In response, Crane asserted that the VersaCheck ledger was not an accurate representation of intended loss because the government could not prove that the conspirators intended each check they printed to be cashed. Crane argued, instead, that the district court should adopt a loss-amount formula based on the average number of successful payouts and confirmed checks used per business per payee.

The district court adequately explained why it rejected Crane's argument. The district court credited the government's evidence and determined that the government's calculation, based on the VersaCheck ledger, witness testimony, and corroborating documents, was a conservative estimation of the intended loss and that the ledger demonstrated the conspirators' intent to cause loss. Specifically, the district court found that the printed checks were given to conspirators who managed the check-cashers, and then, based on the success of the check-cashers and the subjective evaluation of the conspirators, the check-cashers would be given additional checks to cash. Based on this evidence, the district court found that, even though only some of the printed checks were cashed, "the intent to defraud these businesses [was] adequately demonstrated by the check[s] that were printed and provided to these individuals." The indicted conspirators were then each held accountable for the intended loss that occurred during his or her admitted timeframe of participation in the conspiracy.

The district court's factual findings were not clearly erroneous. Based upon evidence presented during the evidentiary hearing, the district court properly determined that the ledger of printed checks was an accurate record of intended loss because it adequately represented the amount of harm that the conspirators sought to inflict. Crane presented minimal evidence to

counter the government's proof, instead pointing to the lack of corroborating physical documentation for some of the entries in the ledger. The district court's factual conclusions regarding the loss amount are due deference in this complicated fraud case, and Crane's quibbling is insufficient to undermine those conclusions. The district court did not clearly err in calculating the intended loss amount.

### D. Downward Variance Sentence

Finally, Crane argues that the district court abused its discretion by failing to vary downward, based upon the "economic reality" principle and the difference between the intended loss ($1,701,529.21) and the actual loss ($263,555.17) attributed to him.

A properly calculated, within-Guidelines sentence is presumed to be substantively reasonable. *See Rita v. United States*, 551 U.S. 338, 347 (2007); *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008). We have recognized that the economic-reality principle may be relevant "[w]here sentencing is based largely or solely on intended loss." *United States v. McBride*, 362 F.3d 360, 375 (6th Cir. 2004). "The underlying theory behind this principle is that 'where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence based on the intended (but highly improbable) loss determination from the [§ 2B1.1] table.'" *Id.* (alteration in original) (citation omitted). But the economic-reality principle is inapplicable where the fraud scheme "was not 'obviously doomed to fail,' nor were the losses from the scheme 'highly improbable.'" *United States v. Jordan*, 544 F.3d 656, 672-73 (6th Cir. 2008); *see McBride*, 362 F.3d at 375.

Crane's 66-month sentence is near the middle of the applicable advisory Guidelines range, and he has not rebutted the presumption of reasonableness. The district court properly considered Crane's variance argument and explained its reasons for imposing a sentence within

the Guidelines range. The district court explained that a variance based on the economic-reality principle was unwarranted here, first, because the fraud was a "successful scheme." The district court determined that the scheme was not doomed to fail and the losses were not highly improbable. Second, the district court specifically considered the *McBride* case and explained that a variance was unwarranted here because the disparity between the actual and intended loss amounts attributed to Crane was not as significant as the disparity justifying departure in *McBride*. Crane's 66-month sentence is not substantively unreasonable, and the district court did not abuse its discretion by imposing it.

## III.

For the foregoing reasons, we AFFIRM the judgments of the district court.